In re **TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION.**

**This document relates to: All economic loss cases.**

**Case No. 8:10ML 02151 JVS (FMOx).**

United States District Court, C.D. California.

Nov. 30, 2010.

Andrea Bierstein, Clinton B. Fisher, Jayne Conroy, Mitchell M. Breit, Paul J. Hanly, Jr., Thomas I. Sheridan, III, Hanly Conroy Bierstein Sheridan Fisher & Hayes LLP, Michael A. London, Douglas & London, Chaim B. Book, Moskowitz Book & Walsh, LLP, New York, NY, Daniel H. Chang, Diversity Law Group APC, Edward Wonkyu Choi, Choi & Associates Law Offices, Gretchen M. Nelson, Kreindler & Kreindler LLP, H. Scott Leviant, Ira R. Spiro, J. Mark Moore, Spiro Moss LLP, Howard B. Miller, Thomas Vincent Girardi, Girardi & Keese LLP, Dana B. Taschner, Lanier Law Firm, Marc M. Seltzer, Ryan C. Kirkpatrick, Steven G. Sklaver, Susman Godfrey LLP, Craig J. Ackermann, Ackermann & Tilajef PC, Brian R.

Strange, Gretchen Carpenter, John Peter Ohanesian, Strange and Carpenter, Lionel Zevi Glancy, Michael Marc Goldberg, Glancy Binkow & Goldberg LLP, Mark John Geragos, Shelley Kaufman, Tamar G. Arminak, Geragos and Geragos, Los Angeles, CA, David C. Wright, Jae Kook Kim, Kristy M. Arevalo, Richard D. McCune, Jr., McCune and Wright LLP, Redlands, CA, Derek Yeats Brandt, Simmons Browder Gianaris Angelides & Barnerd LLC, East Alton, IL, Peter J. Cambs, Jordan Lucas Chaikin, Parker Waichman Alonso LLP, Bonita Springs, FL, Fred R. Rosenthal, Fred Rosenthal Law Offices, Port Washington, NY, Lisa M. Hasselman, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Behram V. Parekh, Heather Marie Peterson, Michael L. Kelly, Kirtland & Packard LLP, El Segundo, CA, Ben Barnow, Barnow & Associates PC, Kenneth A. Wexler, Wexler Wallace LLP, Chicago, IL, Gene J. Stonebarger, Stonebarger Law, APC, Folsom, CA, David M. Arbogast, Jeffrey K. Berns, Arbogast & Berns LLP, Woodland Hills, CA, Mark P. Robinson, Jr., Robinson Calcagnie & Robinson, Newport Beach, CA, Thomas Joseph O'Reardon, II, Timothy G. Blood, Blood Hurst & O'Reardon LLP, Samuel M. Ward, Stephen R. Basser, Barrack Rodos & Bacine, San Diego, CA, Camilo Kossy Salas, III, Salas LC, Cayce Christian Peterson, Hugh Palmer Lambert, Linda Jane Nelson, Lambert & Nelson PLC, Matthew B. Moreland, Attorney at Law, New Orleans, LA, Daniel E. Becnel, Jr., Jennifer L. Crose, June Anne Oswald, Becnel Law Firm, LLC, Reserve, LA, Diane Kay Zink, Attorney at Law Robert M. Becnel, Law Offices of Robert M. Becnel, Christopher Devon Becnel, Toni B. Becnel, Becnel Law Firm, LLC, LaPlace, LA, John Francis Nevares, Attorney at Law, San Juan, PR, Lance August Harke, Harke & Clasby, Miami, FL, J. Andrew Meyer, Tamra Carsten Givens, Morgan & Morgan, PA, Tampa, FL, Scott W. Weinstein, Morgan & Morgan PA, Fort Myers, FL, Andres A. Alonso, Andres F. Alonso, Melanie H. Muhlstock, David Bruce Krangle, Parker Waichman Alonso LLP, Great Neck, NY, Denyse F. Clancy, Renee M. Melancon, Bruce W. Steckler, Baron & Budd PC, Dallas, TX, Benjamin L. Bailey, Eric B. Snyder, Robert P. Lorea, Rodney Arthur Smith, Bailey & Glasser LLP, Edgar F. Heiskell, III, Attorney at Law, Charleston, WV, Mark S. Baumkel, Bingham Farms, MI, Gerald J. Rodos, Jeffrey B. Gittleman, Mark R. Rosen, Barrack Rodos & Bacine, Jeffrey L. Osterwise, Jon J. Lambiras, Sherrie R. Savett, Berger & Montague PC, Larry Pitt, Larry Pitt & Associates PC, Philadelphia, PA, Arthur Camden Lewis, Keith M. Babcock, Lewis & Babcock LLP, John S. Simmons, Simmons Law Firm LLC, Columbia, SC, Thomas J. Murray, Thomas J. Murray & Associates Inc., James L. Murray, John T. Murray, Dennis E. Murray, Jr., Dennis E. Murray, Sr., Margaret M. Murray, William H. Bartle, Murray & Murray Co. LPA, Sandusky, OH, Elizabeth Joan Cabraser, Nimish R. Desai, Robert J. Nelson, Todd A. Walburg, Lieff Cabraser Heimann and Bernstein LLP, San Francisco, CA, Christopher David Stock, Robert Alan Steinberg, Stanley M. Chesley, Wilbert Benjamin Markovits, Waite Schneider Bayless & Chesley Co. LPA, Cincinnati, OH, James E. Cecchi, Lindsey H. Taylor, Carella Byrne Bain Gilfillan Cecchi Stewart & Olstein, Roseland, NJ, Charles T. Lester, Jr., Eric C. Deters, Eric C. Deters & Associates, P.S.C., Independence, KY, Ralph K. Phalen, Ralph K. Phalen Law PC, Kansas City, MO, W. Mark Lanier, The Lanier Law Firm, Fletcher V. Trammell, Bailey Perrin Bailey, Houston, TX, Donald C. Coggins, Jr., John Belton White, Jr., Harrison White Smith and Coggins, Spartanburg, SC, Mark J. Tamblyn, Neha Duggal, Wexler Wallace LLP, Sacramento, CA, Jennifer K. Berg, Baron & Budd PC, Bev-

erly Hills, CA, Laura L. Singletary, Mary Nell Bennett, Richard Joseph Arsenault, Neblett Beard & Arsenault, Alexandria, LA, John R. Climaco, Climaco Lefkowitz Peca Wilcox and Garofoli, Cleveland, OH, for Plaintiff.

Andrew B. Cooke, Elizabeth L. Taylor, Flaherty Sensabaugh & Bonasso, Rebecca A. Betts, David B. Thomas, Nicholas S. Johnson, Allen Guthrie McHugh and Thomas, Charleston, WV, Anne O. Hanna, Vincent Galvin, Jr., Bowman and Brooke LLP, San Jose, CA, Craig Carpenito, Judith Anna Amorosa, Karl Geercken, Kristin Ann Meister, Matthew Carl Decker, Alston and Bird LLP, New York, NY, Cari K. Dawson, Derin B. Dickerson, Kyle G.A. Wallace, Alston & Bird LLP, Atlanta, GA, Clem C. Trischler, James F. Marrion, Pietragallo Gordon Alfano Bosick & Raspanti, LLP, Paula J. Allan, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, Daniel W. Olivas, J. Randolph Bibb, Jr., Lewis, King, Krieg & Waldrop, P.C., Donna L. Roberts, Stephen H. Price, Stites & Harbison, PLLC, Nashville, TN, Gregory A. Harrison, Dinsmore & Shohl, Cincinnati, OH, James Karl Viehman, Hartline Dacus et al., Darren L. McCarty, Alston & Bird, LLP, Dallas, TX, John D. Arya, Lisa Gilford, Roger A. Cerda, Stephanie Ann Jones, Alston & Bird LLP, Rachel Aleeza Rappaport, Loeb & Loeb LLP, Los Angeles, CA, Kathryn Ashley Meyers, Michael Ross Tein, Lewis Tein PL, Coconut Grove, FL, Mary Michelle Kranzow, William Francis Auther, Bowman & Brooke LLP, Phoenix, AZ, Patrick Darrow Wilson, Wright, Lindsey & Jennings, Little Rock, AR, Paul J. Osowski, Nelson Mullins Riley & Scarborough, LLP, Charlotte, NC, Ross W. Johnson, Faegre & Benson LLP, Des Moines, IA, Steven A. McKelvey, William H. Latham, Nelson Mullins Riley & Scarborough LLP, Angela Gilbert Strickland, Pamela J. Roberts, Bowman & Brooke LLP, Columbia, SC, Todd E. Kennedy, Lionel, Sawyer & Collins, Greg W. Marsh, Law Offices of Greg W. Marsh, Las Vegas, NV, C. Brandon Wisoff, Douglas R. Young, Farella Braun and Martel LLP, San Francisco, CA, Bridget M. Ahmann, Demoya R. Gordon, Faegre & Benson LLP, Minneapolis, MN, Charles A. Getto, McAnany, Van Cleave & Phillips, P.A., Holly P. Smith, Shook Hardy & Bacon LLP, Kansas City, MO, Colvin Gamble Norwood, Jr., Henri Wolbrette, III, Jose L. Barro, III, Mark N. Bodin, Patrick J. O'Cain, McGlinchey Stafford, PLLC, New Orleans, LA, Dennis P. Ziemba, Edward A. Gray, Eckert Seamans Cherin & Mellott LLC, Philadelphia, PA, David L. Ayers, Todd Jefferson Hartley, Watkins & Eager, Jackson, MS, David T. Schaefer, Dinsmore & Shohl, Louisville, KY, De Martenson, Huie Fernambucq & Stewart LLP, Birmingham, AL, Joel A. Dewey, DLA Piper U.S. LLP, Baltimore, MD, Jonathan Hale Claydon, Jose A. Isasi, Jose Antonio Isasi II, Greenberg Traurig, LLP, Chicago, IL, Karoline E. Jackson, Michael Rosiello, T. Joseph Wendt, Barnes & Thornburg LLP, Nicholas C. Pappas, Richelle M. Harris, Frost Brown Todd LLC, Indianapolis, IN, Lee A. Rosenthal, Dinsmore & Shohl, Lexington, KY, Ricardo L. Ortiz-Colon, Fiddler, Gonzalez & Rodriguez, San Juan, PR, Sarah C. McBride, Lewis, King, Krieg & Waldrop, P.C., Knoxville, TN, David J. Williams, Stoel Rives, Salt Lake City, UT, John A.K. Grunert, Campbell, Campbell, Edwards & Conroy, P.C., Boston, MA, John W. Knottnerus, Philip A. Rush, Martin Bischoff Templeton Langslet & Hoffman, Portland, OR, Regina M. Rodriguez, Faegre & Benson, LLP, Denver, CO, Robert L. Blank, Rumberger, Kirk & Caldwell, PA, Tampa, FL, Steven Robert Kramer, Eckert, Seamans, Cherin & Mellott LLC, White Plains, NY, Thomas P. Branigan, Bowman & Brooke, Troy, MI, for Defendants.

**1154**

ORDER GRANTING IN PART AND
 DENYING IN PART DEFEN-
 DANTS' MOTION TO DISMISS
 AND MOTION TO STRIKE

JAMES V. SELNA, District Judge.

Table of Contents

I. *Factual Allegations* .................................................. 1156

II. *Article III Standing* .................................................. 1160
 A. *A Manifested SUA Defect Is Not Necessary for Standing* ................. 1161
 B. *Pleading a Cognizable Loss under a "Benefit of the Bargain" Theory* .... 1164
 C. *Lead Plaintiffs Must Plead a Cognizable Loss under a "Benefit of the*
 *Bargain" Theory* ............................................... 1166
 D. *The Warranties Do Not Preclude Standing* ......................... 1167
 E. *Conclusion for Article III Standing* ............................... 1168

III. *Standing to Assert UCL, FAL, and CLRA Claims* .......................... 1168

IV. *Rule 12(b)(6) and Rule 12(f) Standards* ................................. 1169
 A. *Motion to Dismiss Pursuant to Rule 12(b)(6)* ....................... 1169
 B. *Motion to Strike Pursuant to Rule 12(f)* ........................... 1169

V. *Plaintiffs' CLRA, UCL, and FAL Claims (First, Second, and Third Causes*
 *of Action)* ......................................................... 1170
 A. *Heightened Pleading Standard Under Rule 9(b)* ....................... 1170
 1. *Generalized Statements* ...................................... 1171
 2. *Specific Defect Allegations* .................................. 1171
 B. *CLRA Claims* .................................................. 1172
 1. *Material Facts* .............................................. 1173
 2. *Exclusive Knowledge and Active Concealment* .................. 1174
 3. *Damages* ................................................... 1174
 C. *UCL Claims* ................................................... 1175
 D. *FAL Claims* ................................................... 1176
 E. *Motion to Strike CLRA and UCL Claims* ............................. 1177

VI. *Express and Implied Warranties (Fourth and Fifth Causes of Action)* ........ 1177
 A. *Express Written Warranty* ........................................ 1177
 1. *Terms* ..................................................... 1177
 2. *Limited Remedy of Repair or Adjustment* ....................... 1178
 3. *Requirement of Presentment for Repair Within the Warranty*
 *Period and Requirement of Notice Before Filing Suit* .............. 1178
 a. *Contractual Requirement of Presentment for Repair Within*
 *the Warranty Period* ...................................... 1178
 b. *Statutory Requirement of Notice Before Filing Suit* .............. 1180
 4. *Design Defect as Beyond the Scope of "Materials and*
 *Workmanship"* ............................................. 1180
 5. *Unconscionability* .......................................... 1181
 B. *Express Warranty Created by Representations in Advertisements* ........ 1182
 C. *Implied Warranty* .............................................. 1183
 1. *The Requirement of Privity* ................................... 1183
 a. *Exception to Privity Requirement for Third–Party*
 *Beneficiaries* ........................................... 1184
 b. *Exception: Dangerous Instrumentality* ....................... 1185
 2. *Manifestation of Defect* ..................................... 1186

VII. Breach of Contract/Common Law Warranty Claims (Eighth Cause of
 Action) ...................................................1186

VIII. Revocation of Acceptance (Sixth Cause of Action) ...........................1186

 IX. Magnuson–Moss Warranty Act (Seventh Cause of Action) ....................1188
 A. Relation to State Warranty Claims ...................................1188
 B. Requirement that Consumers Follow Dispute Resolution Process ..........1188

 X. Fraud by Concealment (Ninth Cause of Action) ............................1189
 A. Heightened Pleading Requirement and Elements .......................1189
 B. Pleading–with–Particularity Requirement of Fed.R.Civ.P. 9(b) ............1190
 C. Fraudulent Concealment .........................................1191
 1. Duty to Disclose ...........................................1191
 a. Exclusive Knowledge of Material Facts .........................1191
 b. Active Concealment .......................................1192
 c. Partial Representations....................................1193
 2. Remaining Fraud Elements....................................1193

 XI. Unjust Enrichment (Tenth Cause of Action) ...............................1193

XII. Availability of Injunctive Relief .......................................1194
 A. Preemption ..................................................1194
 B. Primary Agency Jurisdiction .....................................1199

XIII. Availability of Restitution and/or Restitutionary Disgorgement ................1200

XIV. Remainder of Motion to Strike .........................................1200

 XV. Conclusion..................................................1200

This action arises out of plaintiffs' purchase of vehicles designed, manufactured, distributed, marketed and sold by Defendants Toyota Motor Corporation dba Toyota Motor North America, Inc. ("TMC"), and its subsidiary, Toyota Motor Sales, U.S.A., Inc. ("TMS") (collectively, "Toyota" or "Defendants").[1] A putative class of domestic Plaintiffs[2] seeks damages for diminution in the market value of their vehicles in light of acknowledged and/or perceived defects in those vehicles.[3] In the Economic Loss Master Consolidated Complaint ("MCC") (Docket No. 263), Plaintiffs assert claims under federal law and California law. Specifically, the MCC asserts claims for (1) Violations of the Consumer Legal Remedies Act, Cal. Civ.Code §§ 1750, et seq. ("CLRA"); (2) Violation of the California Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200, et seq. ("UCL"); (3) Violation of the California

---

1. TMC is a Japanese corporation and is the parent corporation of TMS, which handles sales and marketing in the United States. (MCC ¶¶ 76–77.) The MCC makes allegations as to Defendants collectively, and at times individually. The Court makes such distinctions only when material to the issues presented in the instant motions.

2. Claims by a putative class of foreign Plaintiffs are asserted in a separate consolidated complaint. See Court's Sept. 13, 2010, Order

at 3–4 (Docket No. 341) (appointing Monica R. Kelly as lead counsel for the foreign economic loss Plaintiffs and ordering the filing of a consolidated complaint on behalf of the foreign Plaintiffs); Amended Foreign Economic Loss Master Consolidated Complaint (Docket No. 449).

3. In addition to the putative class of individuals, a small number of business entities—such as an auto dealership and a car rental business—are Plaintiffs as well. (MCC ¶¶ 71–74.)

False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"); (4) Breach of Express Warranty, Cal. Com. Code § 2313; (5) Breach of the Implied Warranty of Merchantability, Cal. Com. Code § 2314; (6) Revocation of Acceptance, Cal. Com.Code § 2608; (7) Violation of the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301, *et seq.* ("MMA"); (8) Breach of Contract/Common Law Warranty; (9) Fraud by Concealment; and (10) Unjust Enrichment.

Defendants have, presumably pursuant to Fed. R. 12(b)(1), moved to dismiss the MCC for lack of Article III standing and, pursuant to Fed.R.Civ.P. 12(b)(6), moved to dismiss all claims for failure to state a claim upon which relief can be granted. (Docket No. 329). Additionally, Defendants have moved to strike certain portions of the MCC (Docket No. 328). (*See also* Defs.' Mem. of Points and Authorities (Docket No. 332) (in support of both Motions) (hereinafter "Defs.' Mem."). Plaintiffs have opposed both motions. (Docket No. 400; *see also* Defs.' Reply, Docket No. 450).)

I. *Factual Allegations* [4]

From 2001 to the present, Defendants have sold tens of millions of vehicles, including models of Toyota, Lexus, and Scion, in the United States and throughout the world that use a fully electronic throttle control system ("ETCS"). (¶¶ 1, 76.) [5] An ETCS differs from a system using a mechanical throttle. (*See* ¶ 2.) A mechanical throttle consists of a cable that connects the accelerator pedal and the engine.

(*Id.*) In contrast, an ETCS does not operate with a cable; instead, in place of the cable, there are "complex computer and sensor systems [that] communicate an accelerator pedal's position to the engine throttle, telling the vehicle how fast it should go." (*Id.*) Toyota began installing these electronic control systems in some Lexus models in 1998 and in Camry and Prius models in 2001 and 2002, and in all Toyota-made vehicles by 2006. (*Id.*)

More specifically, Toyota calls its electronic throttle control system the ETCS-intelligent, or "ETCS-i." (¶ 106.) ETCS-i activates the throttle utilizing the command from the driver's foot that is conveyed electronically from two position sensors in the accelerator pedal, processed in the engine control computer and then transmitted to the throttle. (*Id.*) Toyota began installing ETCS-i in models of the 1998 Lexus. (*Id.*) This earliest of version of Toyota's ETCS included a mechanical link that shut off the throttle. (*Id.*)

In 2001, however, when Toyota redesigned what would become the 2002 Camry, it eliminated the mechanical link in the Camry and other models. (¶ 107.) When it did so, Toyota did not incorporate any type of manual fail-safe mechanism, as other auto manufacturers did. (¶ 108 (citing, *e.g.,* an Audi system that mechanically closed the throttle when the brakes were applied).)

Toyota has employed a number of electronic fail-safe strategies to prevent phenomena such as sudden unintended acceleration ("SUA"). (*See* ¶ 109 (detailing fail-safe strategies employed by Toyota, in-

---

4. As it must, for purposes of the present Motion to Dismiss, the Court accepts as true the factual allegations set forth by Plaintiffs in the MCC. The Court notes that, in some instances, Plaintiffs have referred to specific documents in support of their factual allegations. These documents are not appended to the MCC and have not been filed with the Court. As a

result, these documents have not been examined by the Court, and the Court expresses no opinion regarding whether they support the allegations made in the MCC.

5. All paragraph references are to the MCC, unless otherwise noted.

cluding circumstances under which an engine control computer should cause the engine to stall, reduce the throttle capacity by 70–75%, or close the throttle to idle).) Nevertheless, these strategies did not prevent incidents of SUA. (¶ 110; *see also* ¶ 111 (suggesting other fail-safe methods that could have been employed).)

Other makes of vehicles sold in the United States with electronic throttle control systems employ a "brake-override" system that is designed to assign priority to an attempt by the driver to employ the brake notwithstanding any type of command to open the throttle. (¶¶ 18, 247, 250; *see also* ¶ 248 (" 'If the brake and the accelerator are in an argument, the brake wins,' a spokesman at Chrysler said in describing the systems, which it began installing in 2003.").)

Since as early as 1996, Toyota vehicles have been marketed based on safety. (*See generally* ¶¶ 81–105.) For example, the ETCS's debut in the 1998 LEXUS vehicles was marketed as a safety improvement. (¶ 83 (marketed as a safety feature designed to enhance "vehicle control").) The 2002 Camry was the subject of a press release regarding its "safety and value." (¶ 84.) In their marketing materials, Toyota tied its improved technology, the ETCS, to improved safety. (*See, e.g.,* ¶¶ 94–97.)

Complaints to Toyota and governmental agencies regarding SUA began in 2002. On February 2, 2002, Toyota received its first consumer complaint of a 2002 Camry engine "surging" when the brakes were depressed. Toyota received ten other similar complaints before August 2002. (¶ 114.) A March 2002 internal Toyota document reveals Toyota was unable to discern a cause for the incidents of "surging." (¶ 115.) In August 2002, Toyota released the first of at least three "Technical Service Bulletins" regarding 2002 and 2003 Camry "surging" to its dealers. (¶ 116.)

Toyota did not disclose the existence of these bulletins to consumers. (*Id.*) On August 31, 2002, Toyota recorded its first warranty claim to correct a throttle problem on a 2002 Camry. (¶ 117.)

The following April, in 2003, after a consumer filed with the United States Highway Traffic Safety Administration ("NHTSA") a report of SUA involving a 1999 Lexus, noting that 36 other complaints regarding "vehicle speed control" in these vehicles had been lodged on NHTSA's website, NHTSA opened Defect Petition DP03–003. (¶ 118.) Other reports followed, leading NHTSA to describe the problem to be investigated as "throttle control system fails to properly control engine speed resulting in vehicle surge." (¶ 119.)

As revealed by the investigation, complaints of SUA tended to be significantly higher in Toyota vehicles with an ETCS rather than a mechanical throttle system. (¶¶ 4, 122 (referring to an email from a NHTSA investigator from the Office of Defects Investigation ("ODI") to a Toyota official referring to a 400% difference in "Vehicle Speed" complaints between a specific model with a mechanical throttle and as compared to a later year's version of the same model with an ETCS); *see also* ¶ 5 ("Two of the top five categories of injury claims in NHTSA's Early Warning Reporting Database involved 'speed control' issues on the 2007 Lexus ES350 and Toyota Camry."); ¶ 6 (referring to complaint data lodged with NHTSA), ¶ 9 (referring to "speed control" issues that resulted in death or injury); ¶¶ 124–27 (outlining statistical analyses of publicly available information regarding incidents of SUA in ETCS vehicles).)

Nevertheless, after communications regarding the documents to be provided to NHTSA by Toyota, the investigation of DP03–003 was closed without any adverse

findings. (¶¶ 130–33.) Incidents of SUA continued to be reported, however, in 2004 and 2005. (¶¶ 134–35.) Two subsequent Defect Petitions, one in 2005 and one in 2006, were investigated and closed without adverse findings. (¶¶ 135–48.)

Eventually, pursuant to a congressional investigation, Toyota disclosed that it had received over 37,900 complaints regarding SUA, including five incidents in which dealer service technicians themselves experienced and documented such incidents. (¶¶ 149–54.)

In March 2007, a NHTSA investigation regarding 2007 Lexus vehicles in which the floor mat interfered with the "throttle pedal" or "accelerator pedal" was not expanded to include an investigation of ETCS. (¶¶ 155–67.) Instead, Toyota recalled certain optional "All Weather Floor Mats" on these vehicles. (¶ 168.) Two years later, a request to reopen this investigation was denied; the floor mat problem was "suspected" as causing the incident complained of, but the floor mat's role as a causal factor was not confirmed. (¶¶ 190–95.) Similarly, in early 2008, an investigation of Tacomas and Siennas led to the conclusion that a trim panel on earlier models was responsible for accelerator problems and was remedied with a carpet replacement and retention clip. (¶¶ 177–89.)

Eventually, publicity regarding two accidents, led Toyota on September 29, 2009, to announce a floor mat recall involving approximately 3.8 million vehicles. (¶ 202.) One accident was a very high-profile fatal crash, caused by a mis-matched and improperly installed floor mat, and involved an off-duty police officer who was driving a Lexus lent to him by a dealership. (See ¶¶ 196–201). At the time of the floor mat recall, Toyota made statements to the media regarding NHTSA's supposed confirmation that, once the floor mats were properly installed, no other defect was present in the recalled vehicles. (¶ 205.)

Within days, NHTSA clarified its statement in its own press release, stating that its position was that the floor mat recall was simply an interim measure and that it did not correct the underlying defect. (¶ 206.)

On the same day that the floor mat recall was made in the United States, Toyota issued a Technical Information Bulletin to foreign Toyota distributors, identifying a procedure to repair "sticky accelerator pedals" and sudden RPM increases and/or sudden acceleration. (¶ 203.) However, no similar bulletins were issued on that day in the United States, and no other steps were taken to address sticky accelerator pedals. (Id.) There was no mention in Toyota's September 29, 2009, Consumer Safety Advisory of sticky accelerator pedals; instead, the Advisory claimed that the sudden acceleration problem was caused by irregularities in the vehicles' floor mats. (¶ 204.)

Internal communications from around that time reveal, however, that Toyota was aware of sticky accelerator pedal problems in the United States. (¶¶ 209–13.) This defect was described as a mechanical failure in the pedals themselves rather than an ETCS failure. (See e.g., ¶ 213.) Toyota representatives met with NHSTA officials in Washington, D.C., on January 19, 2010, about the problem, and on January 21, 2010, issued the sticky pedal recall, which affected approximately 2.3 million vehicles. (¶ 215.) On January 26, 2010, Toyota suspended sales of a number of models, resuming on February 5, 2010. (¶ 216.)

In connection with this recall, NHTSA imposed a $16.375 million civil penalty on Toyota for its failure to inform NHTSA regarding the sticky pedal defect, which Toyota agreed to pay. (¶ 217.)

Even after the floor mat and the sticky pedal recalls, however, incidents of SUA persisted, and Plaintiffs allege that "Toyota [c]ontinues to [wrongly] [d]eny [ETCS]

[d]efects," criticizing Toyota's testing of component parts and reiterating certain comments made by lawmakers in connection with a congressional investigation. (¶ 219 and subheading D at p. 97; *see also* ¶ 221 (criticizing Toyota testing of ETCS component parts, which is delegated to suppliers); ¶ 224 (congressional statement regarding Toyota's failure to take into account the 400% increase in SUA in ETCS vehicles when compared to non-ETCS vehicles); ¶ 226 (congressional statement criticizing a flawed expert report); ¶ 228 (congressional statement criticizing the apparent attitude that the recalls have solved the SUA problem).) Plaintiffs also detail changes in quality control practices at one Toyota manufacturing plant. (¶¶ 231–35.)

Upon receipt of a claim for SUA, Toyota typically rejects any claim of defect and does not inform the claimant of the existence of hundreds or thousands of other, similar claims. (¶ 236.) In one instance, a claimant requested that Toyota address specific questions she had about how it reached its conclusion that her car suffered no defect when she had no floor mat on the drivers' side; Toyota did not explain its conclusion. (¶¶ 238–41.) Similarly, when confronted with an engineering report attributing an SUA incident to the ETCS, Toyota claimed that "there have been no confirmed or documented reports or findings of any type of computer malfunctions related to the brake/acceleration or electrical systems." (¶ 242.) Denials were issued even where officers investigating an accident gave the opinion that, given the rough ride and the impact, it was unlikely that the driver continued to manually accelerate the vehicle. (¶ 243.) Additionally, a Toyota official "falsely stated on repeated occasions that 'the brakes will always override the throttle.'" (¶ 244 (internal quotation marks omitted).)

Plaintiffs attribute incidents of SUA to any number of specified electronic or mechanical issues, including the ETCS, floor mat interference, and sticky pedals. (¶ 245(1)-(2).) They also claim that SUA incidents may be due to the failure to develop and implement an appropriate failsafe method (such as a brake-override system) and/or the failure to test and validate vehicle systems properly. (¶ 245(3)(4)).

In response to a request for internal Toyota documents by a congressional committee investigated SUA complaints, Toyota identified 37,900 customer contact reports, randomly selected 3,430 of them, and determined that 1,008 of those reports were related to SUA. (¶ 12.) Toyota provided these documents to the congressional committee. (*Id.*) In the data the committee reviewed, telephone operators on the Toyota customer complaint line, relying on customer reports and information from dealer inspections, identified floor mats or sticky pedals as the cause of only 16% of the SUA incident reports. (¶ 15.)

Toyota eventually added a brake-override system as standard equipment in its 2011 model-year vehicles. (¶¶ 18, 251.) On February 22, 2010, Toyota announced that it will provide brake-override systems as a "confidence booster" (rather than a safety recall) on a number of models, but not on all models Plaintiffs claim are subject to the SUA defect.[6] (¶¶ 18, 252–55.)

Plaintiffs allege that Toyota officials have acknowledged that the SUA defect has not been completely remedied by the floor mat and "sticky pedal" recalls. (¶ 20 (second-highest ranking North American executive, when asked, stated that recalls will "not totally" solve the SUA problem); *see also* ¶¶ 21–23 (allegations regarding more generalized acknowledgment of safety failures by Toyota officials).)

---

**6.** Plaintiffs allege that internal Toyota documents reveal that Defendants knew of the need for a brake-override system as early as 2007. (¶¶ 19, 249.)

As a result of publicity regarding the SUA defect, the value of Toyota cars diminished. (¶¶ 24, 256.) Many consumers sought to return their cars out of fear that SUA could occur and cause catastrophic injury or death. (¶ 24.) Toyota has refused to take class members' vehicles back, and has refused to and cannot provide an adequate repair. (¶¶ 24, 256, 257–59 (providing examples of diminution in value).)

The individual Plaintiffs (or "consumer Plaintiffs") named in the MCC include Plaintiffs who are citizens of California, Illinois, Tennessee, Maryland, Florida, Massachusetts, Ohio, Pennsylvania, Washington, Missouri, Arizona, Iowa, New York, Nevada, Michigan, Colorado, Nebraska and Virginia. (¶¶ 32–69.) Plaintiffs also include an individual who was motivated to buy a Toyota vehicle based upon their reputation for safety. (¶ 41.) Additionally, Plaintiffs include individuals who have experienced SUA, and those who have not experienced SUA but have nevertheless chosen not to use their vehicles since being notified of the potential for SUA. (*See, e.g.,* ¶¶ 32, 37.) They include individuals whose requests for substitute vehicles have been refused, who have been directed by Toyota Customer Experience Center to file a claim with the National Center for Dispute Settlement (only to be informed by the National Center for Dispute Settlement that it could not resolve the claim), and who have been directed to file an arbitration claim. (¶¶ 32, 40, 49.)

The non-consumer Plaintiffs (or "commercial Plaintiffs") are a California auto dealership, a Missouri auto dealer, a New Jersey residual insurer/vehicle liquidator, and a Nevada corporation [7] that operates a rental car business. Each commercial Plaintiff has purchased, or insured the residual value of, allegedly defective Toyota vehicles. (¶¶ 71–74.)

The Court repeats, as it stated above (n. 4), that the truth of these allegations is assumed at the pleadings stage.

## II. *Article III Standing*

Toyota challenges Plaintiffs' Article III standing to bring the present action. Presumably, Toyota does so under Fed. R.Civ.P. 12(b)(1), which allows dismissal of an action for lack of subject matter jurisdiction. *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1122 (9th Cir.2010) ("Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss.").

Standing under Article III requires three elements. First, Plaintiffs must suffer an "injury in fact," which means that there must be a concrete and particularized "invasion of a legally protected interest" that is actual or imminent. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Second, Plaintiffs must allege a causal connection between the injury and the conduct complained of, which means that the injury must be "fairly traceable" to Defendants' actions. *Id.* Third, Plaintiffs must show that a favorable decision will likely redress the injury. *Id.* at 561, 112 S.Ct. 2130. Although Plaintiffs bear the burden of establishing standing, "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage. *Id.*

Toyota contends that Plaintiffs fail to allege an "injury in fact." [8]

---

7. The Nevada corporation is alleged to have its "nerve center" and "principal place of business" in California. (¶ 74).

8. Toyota argues in passing that "[a]dditionally, Plaintiffs cannot satisfy the causal connection requirement for standing because they have not alleged an actual injury which was

## A. *A Manifested SUA Defect Is Not Necessary for Standing*

■ Toyota points out that numerous Plaintiffs have not experienced the alleged SUA defect. (Defs.' Mem. at 10.) In the absence of a manifested defect, Toyota argues that those Plaintiffs lack standing because the mere possibility of a defective vehicle is not actual or imminent. Because courts have routinely "rejected the type of defect-without-malfunction theory asserted by many of the Plaintiffs in this lawsuit," (Defs.' Mem. at 10), Toyota urges the Court to adopt the same approach here. Plaintiffs respond that the absence of a manifested defect is not controlling because Plaintiffs' injuries consist of economic losses—that is, the diminished value of Plaintiffs' vehicles after the SUA defect was made public. (Pltfs.' Opp'n at 10–14.)

The Court agrees with Plaintiffs that experiencing an SUA defect is not required for standing. Standing merely requires a redressable injury that is fairly traceable to Defendants' conduct. Whether a plaintiff can recover for that injury under a particular theory of liability is a separate question. Here, Plaintiffs allege economic loss injuries, which may or may not be recoverable under Plaintiffs' claims in the MCC. These alleged economic injuries are sufficient.[9]

The Court's decision is supported by the Fifth Circuit's opinion in *Cole v. General Motors Corp.*, which held that economic loss allegations were sufficient to establish an injury in fact. 484 F.3d 717, 722–23 (5th Cir.2007). The plaintiffs in *Cole* alleged that a defendant automobile company designed defective side air bags that unexpectedly deployed in cars. *Id.* at 720. The putative class in *Cole*, which excluded those "who sustained bodily injury or death as the result of the unexpected or premature deployment of a side impact air bag," sought recovery of "the difference between the value of the vehicle as delivered and the value it would have had if it had been delivered as warranted." *Id.* at 719–20. The defendant automobile company argued that "plaintiffs lack standing because the air bags in their vehicles never deployed inadvertently, and therefore, they cannot have suffered an injury in fact." *Id.* at 722. Without "actual deployment, plaintiffs' injury is speculative because plaintiffs can only claim that the [air bags] in their vehicles were potentially defective." Plaintiffs countered that they "suffered economic loss satisfying the inju-

caused by Toyota's conduct." (Defs.' Mem. at 9.) As is evident in the subsequent subheadings, (*see* Defs.' Mem. at 10, 13), Toyota does not develop this alternative argument in its Motion—or, at a minimum, clearly differentiate it from its "injury in fact" arguments. Therefore, the Court does not address it.

9. The Court recognizes that the injury-in-fact requirement can sometimes be satisfied by a credible threat of future harm. *See, e.g., Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir.2007) (holding that "the injury-in-fact requirement can be satisfied by a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions."); *Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir.2003) (stating that "courts of appeals have generally recognized that threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes."); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947–48 (9th Cir.2002) (holding that "a credible threat of harm is sufficient to constitute actual injury for standing purposes," especially environmental harms, because "monetary compensation may well not adequately return plaintiffs to their original position."). Thus, it is at least conceivable that a credible threat of a manifested SUA defect might be sufficient, in and of itself, to confer standing—which would be consistent with Plaintiffs' "ticking time bomb" argument. (*See* Pltfs.' Opp'n at 9.) However, Plaintiffs do not pursue standing on this basis, and therefore the Court does not entertain the possibility further.

ry-in-fact requirement because the [airbags] in all [cars] were defective at the moment of purchase." *Id.*

The Fifth Circuit held that the economic loss injuries asserted by the plaintiffs were sufficient to confer standing. *Id.* at 723. In doing so, the court underscored the difference between two distinct inquiries: the inquiry into whether the plaintiffs sufficiently allege an "injury" for standing purposes with the inquiry into whether the plaintiffs' theories of recovery are viable:

> Plaintiffs seek recovery for their actual economic harm (e.g., overpayment, loss in value, or loss of usefulness) emanating from the loss of their benefit of the bargain. Notably in this case, plaintiffs may bring claims under a contract theory based on the express and implied warranties they allege. Whether recovery for such a claim is permitted under governing law is a separate question; it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered.

*Id.*

In principle, the Court agrees with *Cole* that "overpayment, loss in value, or loss of usefulness" is sufficient to confer standing. Here, Plaintiffs allege that "Toyota vehicles with ETCS are defective." (¶ 8.) They further allege that a "statistically significant increase in the number of unintended acceleration complaints put Toyota on notice that there was a defect in its vehicles with ETCS that could cause SUA" (¶ 128), and that "[t]his defect renders the vehicles

unsafe." (¶ 9.) As a result of the SUA defect and the ensuing safety concerns, Plaintiffs allege that "each Plaintiff did not receive the benefit of their bargain and/or overpaid for their vehicles, made lease payments that were too high and/or sold their vehicles at a loss when the public gained partial awareness of the defect." [10] (¶ 70.)

Accepting these allegations as true, every Toyota vehicle with ETCS is defective and has a statistically significant propensity for SUA. While a statistically significant propensity for SUA may not be considered "actual" or "imminent," the *market effect* of the alleged SUA defect undoubtedly *is* actual or imminent (as well as concrete and particularized): According to Plaintiffs' allegations, Toyota vehicles with ETCS dropped in value owing to the alleged SUA defect. If a defect causes SUA to manifest itself in a small percentage of Toyota vehicles, it makes sense that people would be less willing to buy or use those vehicles on the off-chance that they might experience the SUA defect. All else being equal, prices typically decrease when demand decreases. Hence, the alleged economic loss.[11]

Toyota argues that the weight of authority is contrary to *Cole*. (Defs.' Reply at 5–6.) *See, e.g., Briehl v. Gen. Motors Corp.,* 172 F.3d 623, 628 (8th Cir.1999) ("Where, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies."); *Contreras v. Toyota Motor Sales USA,*

---

**10.** Plaintiffs also allege that the commercial Plaintiffs "overpaid for the vehicles" and "suffered lost profits and other economic losses due to [their] inability to sell the Toyota vehicles." (¶¶ 71–74.)

**11.** This reasoning would hold true at the time of purchase, *Kearney v. Hyundai Motor Co.,* SACV 09–1298 DOC (MLGx), 2010 U.S. Dist. LEXIS 68242, at *12, 14 (C.D.Cal. June 4,

2010) (adopting *Cole's* logic and explaining that the "alleged defects reduced the car's value and deprived the consumer of the benefit of the bargain, even when the alleged defects did not later materialize—i.e., the loss was suffered 'at the moment' of purchase.") (emphasis in the original), or, as plaintiffs allege, at the time that the SUA defect became known to the public. (¶ 70).

*Inc.*, No. C 09–06024 JSW, 2010 WL 2528844, at *6 (N.D.Cal. June 18, 2010) (holding that plaintiffs failed to sufficiently allege an injury in fact because there were no allegations that plaintiffs' "vehicles have manifested the alleged defect" and the "allegation that their vehicles are worth substantially less than they would be without the alleged defect is conclusory and unsupported by any facts."); *Wallis v. Ford Motor Co.*, 208 S.W.3d 153, 159, 362 Ark. 317 (Ark.2005) (stating that "numerous other jurisdictions have refused to award benefit-of-the-bargain damages when there is no allegation that the product received was not the bargained-for product," and holding that "common-law fraud claims not resulting in injury are not actionable."); *Ziegelmann v. Daimler-Chrysler Corp.*, 649 N.W.2d 556, 559, 2002 ND 134 (N.D.2002) ("In this jurisdiction, the torts of negligence, fraud and deceit require proof of actual damages as an essential element of a plaintiff's case, and if no actual loss has occurred, the plaintiff fails to establish liability."); *O'Neil v. Simplicity, Inc.*, 553 F.Supp.2d 1110, 1115 (D.Minn.2008) ("It is simply not enough for a plaintiff to allege that a product defect suffered by others renders his or her use of that same product unsafe; the plaintiff must instead allege an actual manifestation of the defect that results in some injury in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment."); *Whitson v. Bumbo*, No. C 07–05597 MHP, 2009 WL 1515597, at *6 (N.D.Cal. Apr. 16, 2009) (holding that plaintiff "does not have standing for her claims under a 'benefit of the bargain' theory or any other stated theory" because plaintiff failed "to allege that her [baby seat] manifested the purported defect" or that "a purchase of a

substitute for her allegedly defective [baby seat] was necessary.").

Two considerations lead the Court to conclude that Toyota's line of authority should not control the outcome here. First, cases such as *Briehl, Wallis, Ziegelmann,* and *O'Neil* did not address whether an "injury in fact" had been sufficiently alleged for purposes of Article III standing, but rather whether damages were sufficiently alleged in order to support a claim under the theories pled.[12] The "injury in fact" required for standing is conceptually distinct from "damages" required under a particular theory or theories of liability. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264–65 (2d Cir.2006). The Second Circuit's analysis in *Denney* is worth quoting at length for this proposition, particularly because the court grounded its holding in the precedent of the United States Supreme Court:

> [A]n injury-in-fact differs from a "legal interest"; an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law. An injury-in-fact may simply be the fear or anxiety of future harm. For example, exposure to toxic or harmful substances has been held sufficient to satisfy the Article III injury-in-fact requirement even without physical symptoms of injury caused by the exposure, and even though exposure alone may not provide sufficient ground for a claim under state tort law. *See Whitmore [v. Arkansas* ], 495 U.S. [149] at 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 [ (1990) ] ("Our threshold inquiry into standing 'in no way depends on the merits of the [plaintiff's claim.]' ") (quoting *Warth*, 422 U.S. at 500, 95 S.Ct. 2197); *In re Agent Orange Prod. Liab. Litig. (Ivy v. Diamond Shamrock Chem-*

---

**12.** In other words, these cases were decided under Fed.R.Civ.P. 12(b)(6), or the analogous state rule, for failure to state a claim.

*icals Co.*), 996 F.2d 1425, 1434 (2d Cir. 1993) (rejecting argument that "injury in fact means injury that is manifest, diagnosable or compensable") (internal quotation marks omitted), *overruled in part on other grounds by Syngenta Crop Prot., Inc. v. Henson,* 537 U.S. 28, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002); Wright, Miller & Kane, *supra,* § 1785.1 ("[T]his requisite of an injury is not applied too restrictively. If plaintiff can show that there is a possibility that defendant's conduct may have a future effect, even if injury has not yet occurred, the court may hold that standing has been satisfied."). The risk of future harm may also entail economic costs, such as medical monitoring and preventative steps; but aesthetic, emotional or psychological harms also suffice for standing purposes. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Moreover, the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing. *See Sutton,* 419 F.3d at 574–75 (holding that the increased risk that a faulty medical device may malfunction constituted a sufficient injury-in-fact even though the class members' own devices had not malfunctioned and may have actually been beneficial).

*Id.* Plaintiffs here have clearly established "injury in fact."

Second, to the extent that cases such as *Contreras* and *Whitson* (or any of the cited cases) hold that standing cannot be established absent a manifested defect, and the former cases can be read to support that proposition, the Court disagrees: As long as plaintiffs allege a legally cognizable loss under the "benefit of the bargain" or some other legal theory, they have standing.

**B.** *Pleading a Cognizable Loss under a "Benefit of the Bargain" Theory*

■ Toyota argues that Plaintiffs' "benefit of the bargain" theory does not work because the benefit of the bargain covers manifest or extant defects—not latent defects. (*See* Defs.' Reply at 4.) For example, in *Coghlan v. Wellcraft Marine Corp.,* 240 F.3d 449 (5th Cir.2001), the plaintiffs purchased a boat manufactured by the defendant. *Id.* at 451. Defendants advertised that their boats were made completely of fiberglass, which were more durable and held their value better than boats made of a wood-fiberglass combination. *Id.* A few months after the purchase, however, the plaintiffs discovered that their boat was actually made of both wood and fiberglass, and they brought suit alleging claims under various consumer protection statutes and implied warranty. *Id.* The district court dismissed the entire complaint for failing to allege any cognizable damages, but the Fifth Circuit reversed. *Id.* In doing so, the court stated:

> The key distinction between this case and a "no-injury" product liability suit is that the [plaintiffs'] claims are rooted in basic contract law rather than the law of product liability: the [plaintiffs] assert they were promised one thing but were given a different, less valuable thing. The core allegation in a no-injury product liability class action is essentially the same as in a traditional products liability case: the defendant produced or sold a defective product and/or failed to warn of the product's dangers. The wrongful act in a no-injury products suit is thus the placing of a dangerous/defective product in the stream of commerce. In contrast, the wrongful act alleged by the [plaintiffs] is [defendants'] failure to uphold its end of their bargain and to deliver what was promised. The striking feature of a typical no-injury class is that the plaintiffs have either not yet

experienced a malfunction because of the alleged defect or have experienced a malfunction but not been harmed by it. *Therefore, the plaintiffs in a no-injury products liability case have not suffered any physical harm or out-of-pocket economic loss. Here, the damages sought by the [plaintiffs] are not rooted in the alleged defect of the product as such, but in the fact that they did not receive the benefit of their bargain.*

*Id.* at 455 n. 4 (emphasis added).

According to Toyota, *Coghlan*'s logic was reasonably applied in *Kearney v. Hyundai Motor Co.*, SACV 09–1298 DOC (MLGx), 2010 U.S. Dist. LEXIS 68242, at *1, 14 (C.D.Cal. June 4, 2010), which dealt with alleged defects in the front passenger-side air bag system in certain lines of automobiles. (Defs.' Reply at 4.) In *Kearney*, the plaintiffs alleged that their vehicles failed to properly activate the front passenger side air bag capability when an adult was seated in the front passenger seat. *Id.* at *3. Federal regulations require vehicles "with advanced air bags [to] 'be equipped with an automatic suppression feature for the passenger air bag which results ... in activation of the air bag system' when a properly seated 105–pound individual occupies the front side passenger seat." *Id.* at *2. The plaintiffs alleged that this system "failed to activate airbag capability when the 115–pound Nancy Kearney was seated in the front passenger seat" and failed "to activate the front side passenger air bag when the Moores' 117–pound daughter occupies the front side passenger seat." *Id.* at *3. Plaintiffs sued for the diminution in value of their vehicles as a result of the alleged defects and the deprivation of their contractual or property interest in their vehicles which resulted from the plaintiffs "being provided with a car of a different quality than they were promised." *Id.* at *10. Although defendant automobile company argued that the plaintiffs lacked

standing, the court disagreed and adopted *Cole*'s logic: "the court in *Cole* was concerned with the same situation alleged here—the receipt of a vehicle whose alleged defects reduced the car's value and deprived the consumer of the benefit of the bargain, *even when the alleged defects did not later materialize—i.e.,* the loss was suffered 'at the moment' of purchase." *Id.* at *14 (emphasis in the original).

Toyota argues that *Coghlan* and *Kearney* stand for the proposition that standing under a "benefit of the bargain" theory is warranted only when every product manifests the alleged defect. In *Coghlan,* the plaintiffs did not receive an all-fiberglass boat; in *Kearney,* every passenger-side air bag system was defective because it failed to activate when adults of small stature were properly seated. According to Toyota, Plaintiffs cannot argue a *Coghlan*-type injury because they got precisely what they bargained for: a car with ETCS. To the extent that Plaintiffs assert a lack of a brake override system or other additional safety feature, such allegations fall short because they were not part of the original benefit of the bargain. Moreover, Plaintiffs cannot allege the type of injury recognized in *Kearney* because Plaintiffs do not, and cannot, allege that all of their vehicles manifested the SUA defect. Thus, Plaintiffs who did not experience SUA are foreclosed from arguing that they did not receive the benefit of the bargain.

The Court disagrees. First, Plaintiffs essentially allege that they contracted for safe vehicles that start and stop upon proper application of the accelerator and brake pedals. Plaintiffs allegedly received defective vehicles subject to dangerous SUA events, meaning that Plaintiffs' vehicles sometimes do not start and stop as promised. Accepting these allegations as

true, they are sufficient to fall under the "benefit of the bargain" rubric.

Second, under a "benefit of the bargain" theory, Plaintiffs must allege "overpayment, loss in value, or loss of usefulness." When those losses are sufficiently pled, they confer standing. Several Plaintiffs allege that they sold or traded in their vehicles at a loss owing to the alleged SUA defect, and these allegations suffice. For example:

- Plaintiff Kathleen Atwater alleges that she "traded in her 2009 RAV4 on February 13, 2010, for a 2010 Ford Fusion" and that she "received less for the sale of her RAV4 than she would have received if the vehicle did not have an SUA defect." (¶ 32.)

- Plaintiff Richard Benjamin alleges that he "has seen the trade-in value [of his 2007 Toyota Sienna] drop $2,000 since the recalls" were made public. (¶ 35.)

- Plaintiff Brandon Bowron "sold his Lexus on July 7, 2010," and alleges he "received less value for the car due to the SUA defect." (¶ 36.)

- Plaintiff Matthew Heidenreich "sold his 2010 Corolla to NHTSA for research," and allegedly "lost money on the sale" because "NHTSA only paid the KELLEY BLUE BOOK value." (¶ 52.)

- Plaintiff Mary Ann Tucker sold her 2005 Toyota Camry "on March 10, 2010, for $9,000," and alleges she "received less for her vehicle than she would have had her Camry not had a[n] SUA defect." (¶ 65.)

- Plaintiffs Dana and Douglas Weller sold their Toyota RAV4 on March 13, 2010, and allege that they "received less for their trade-in vehicle than they would have had their RAV4 not had a[n] SUA defect." (¶ 68.)

These specific allegations are not conclusory, and substantiate the alleged "overpayment, loss in value, or loss of usefulness." It is true that Plaintiffs do not generally allege the precise dollar value of their losses, but that level of specificity is not required at the pleadings stage. It is enough that they allege a tangible loss that can be proved or disproved upon discovery.

### C. Lead Plaintiffs Must Plead a Cognizable Loss under a "Benefit of the Bargain" Theory

Even accepting that Plaintiffs' "benefit of the bargain" theory confers standing for those who allege an "overpayment, loss in value, or loss of usefulness," Toyota argues that some allegations of lead Plaintiffs are deficient. As currently pled, several plaintiffs do not allege any loss, as in the following representative examples:

- Plaintiff Ebony Brown is a resident and citizen of Illinois. She owns a 2009 Toyota Camry. (¶ 38.)

- Plaintiff Gary Davis is a resident and citizen of Tennessee. He owns a 2008 Toyota Camry LE. Mr. Davis purchased his Toyota based on its reputation for safety. (¶ 41.)

- Plaintiff Alexander Farrugia is a resident and citizen of New York. He owns a 2009 Toyota Highlander. (¶ 43.)

- Carole Fisher is a resident and citizen of Nevada. She owns a 2010 Toyota Prius that she purchased on June 6, 2009. (¶ 44.)

- Plaintiff John Flook is a resident and citizen of Maryland. He owns a 2010 Toyota Corolla. (¶ 46.)

- Plaintiff Kevin Funez is a resident and citizen of Florida. He owns a 2006 Toyota Avalon. (¶ 47.)

- Plaintiff Donald Graham is a resident and citizen of Colorado. He owns a 2007 Toyota Prius. (¶ 50.)

● Plaintiff Rodney Josephson is a resident and citizen of Massachusetts. He owns a 2010 Toyota Corolla. (¶ 53.)

The Court agrees that these allegations do not go far enough to establish standing under a benefit of the bargain theory.

█ It is true that Plaintiffs generally allege that "each Plaintiff did not receive the benefit of their bargain and/or overpaid for their vehicles, made lease payments that were too high and/or sold their vehicles at a loss when the public gained partial awareness of the defect." (¶ 70.) As discussed previously, the Court accepts in principle that these allegations are sufficient to confer standing. However, "[i]n a class action, the lead plaintiffs must show that they personally have been injured, 'not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F.Supp.2d 1157, 1163 (C.D.Cal.2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). General allegations of loss such as those contained in paragraph 70 of the MCC may suffice for the putative class, *see Denney*, 443 F.3d at 263–64 (drawing distinction between lead plaintiffs and represented plaintiffs and stating that "[w]e do not require that each member of a class [i.e., represented members] submit evidence of personal standing."), but that does not excuse lead Plaintiffs from specifically alleging injury.[13]

Such allegations are necessary because lead Plaintiffs must have standing to sue prior to class certification. *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir.2009) ("*Before* a class is certified, it is true, the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit.") (emphasis in the original).[14] In order to ascertain whether lead Plaintiffs have standing, it seems reasonable to require specific allegations by the lead Plaintiffs that support a cognizable injury under Article III, which would preferably be detailed enough so that the Court and Toyota would have no trouble discerning what constitutes the injury—e.g., the "overpayment, loss in value, or loss of usefulness."

D. *The Warranties Do Not Preclude Standing*

Toyota argues that all Plaintiffs lack injuries because all received the benefit of the bargain from their warranties. (Defs.' Mem. at 13–14.) The exclusive remedy for those who have experienced a defect or malfunction is to obtain warranty repairs from an authorized dealer. The same reasoning applies, *a fortiori*, to those who have not experienced a defect or malfunction. *Cf. Thiedemann v. Mercedes–Benz USA, LLC*, 183 N.J. 234, 251, 872 A.2d 783 (2005) (stating that automobile "defects that arise and are addressed by warranty, at no cost to the consumer, do not provide

---

**13.** While "only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class," *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck–Medco Managed Care, LLC*, 504 F.3d 229, 241 (2d Cir.2007), that means that a class action can proceed as long as one of the lead plaintiffs has standing. It does not obviate the need for other lead plaintiffs, seeking to proceed as such, to establish standing.

**14.** *But see Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (stating in dicta that "general allegations of the complaint in the present case may well have sufficed to claim injury by named plaintiffs, and hence standing to demand remediation, with respect to various alleged inadequacies in the prison system, including failure to provide adequate legal assistance to non-English-speaking inmates and lockdown prisoners," but stating that "[this] point is irrelevant now, however, for we are beyond the pleading stage.").

the predicate 'loss' that the CFA [New Jersey Consumer Fraud Act] expressly requires . . . .").

Plaintiffs respond that Toyota has not agreed to repair or replace all class members' vehicles. (Pltfs.' Opp'n Brief at 14–15.) Toyota has not identified the root cause of most SUA events, the continuing defect is confirmed by SUA events occurring after recalls, and the purported warranty benefit does not address the diminished value of Plaintiffs' vehicles. (Pltfs.' Opp'n Brief at 16.)

The Court agrees with Plaintiffs that they have alleged an injury-in-fact despite Toyota's warranties. First, for the reasons discussed above, Toyota conflates the inquiry into whether Plaintiffs sufficiently allege an "injury" for standing purposes with the inquiry into whether Plaintiffs' theory of recovery is viable. Plaintiffs allege that they overpaid for defective vehicles owing to the SUA defect. Whether Plaintiffs can recover for their losses owing to the warranties or some other reason is a separate question. For purposes of standing, the alleged economic losses are sufficient.

Second, the Court agrees that Plaintiffs sufficiently allege that they have not received the benefit of the express warranties in the Warranty Manual.

### E. Conclusion for Article III Standing

Accordingly, for the foregoing reasons, the Court grants Toyota's Motion to Dismiss the claims of the lead Plaintiffs who do not sufficiently allege a loss, but otherwise holds that Plaintiffs have adequately established Article III standing.[15] The Plaintiffs who have failed to sufficiently

allege standing are granted leave to amend.

### III. Standing to Assert UCL, FAL, and CLRA Claims

Certain claims asserted by Plaintiffs are subject to particularized standing requirements.

■ The UCL and FAL provide a private right of action only if Plaintiffs have "suffered injury in fact and [have] lost money or property as a result of the unfair competition." Cal. Bus. & Prof.Code § 17204; Clayworth v. Pfizer, Inc., 49 Cal.4th 758, 788, 111 Cal.Rptr.3d 666, 233 P.3d 1066 (2010). "A person whose property is diminished by a payment of money wrongfully induced is injured in his property." Id. (quoting Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906)). Overcharges paid as a result of unfair business practices are sufficient for UCL standing. See id. (holding that overcharges paid as a result of a price-fixing conspiracy were sufficient to support UCL standing); Von Koenig v. Snapple Beverage Corp., 713 F.Supp.2d 1066, 1078 (E.D.Cal.2010) (holding that the plaintiffs sufficiently alleged injury under the UCL, FAL, and CLRA by asserting that the product they received was worth less than what they paid for it owing to defendants' misleading labels).

Here, Plaintiffs allege that they "overpaid for their vehicles, made lease payments that were too high and/or sold their vehicles at a loss when the public gained partial awareness of the defect." (¶ 70.) While these allegations may generally be sufficient to establish a money or property

---

**15.** Because the Court has concluded that at least some Plaintiffs have standing, the Court, throughout this Order, discusses whether those Plaintiffs have asserted claims upon which relief can be granted. Cf. Steel Co. v.

Citizens for a Better Environment, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (rejecting a court's practice of "assuming" jurisdiction for the purpose of deciding the merits).

loss under the UCL and FAL, the Court grants Toyota's Motion to Dismiss on this issue as to the lead Plaintiffs who have failed to plead "overpayment, loss in value, or loss of usefulness." [16] The dismissal is without prejudice.

### IV. *Rule 12(b)(6) and Rule 12(f) Standards*

#### A. *Motion to Dismiss Pursuant to Rule 12(b)(6)*

■■ In addition to challenging Plaintiffs' standing to assert their claims, Toyota moves to dismiss all claims for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). Pursuant to Rule 12(b)(6), a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* — U.S. —, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

■ In resolving a Rule 12(b)(6) motion under *Twombly,* the Court must follow a two-pronged approach. First, the Court must accept all well-pleaded factual allegations as true, but "[t]hread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Nor must the Court "accept as true a legal conclusion couched as a factual allegation." *Id.* at 1949–50 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Second, assuming

the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. This determination is context-specific, requiring the Court to draw on its experience and common sense; there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

#### B. *Motion to Strike Pursuant to Rule 12(f)*

■ Under Rule 12(f), a party may move to strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Fed.R.Civ.P. 12(f). The grounds for a motion to strike must appear on the face of the pleading under attack, or from matters which the Court may take judicial notice. *SEC v. Sands,* 902 F.Supp. 1149, 1165 (C.D.Cal.1995). The essential function of a Rule 12(f) motion is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993); *Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885 (9th Cir. 1983). Where a party moves to strike a prayer for damages on the basis that the damages sought are precluded as a matter of law, the request is more appropriately examined as a motion to dismiss. *See Whittlestone, Inc. v. Handi–Craft Co.,* 618 F.3d 970, 974–75 (9th Cir.2010) ("We therefore hold that Rule 12(f) does not authorize district courts to strike claims

---

**16.** Toyota also contends that Plaintiffs do not plead actual reliance to satisfy the standing requirements. (Defs.' Mem. at 17–19.) Because the Court grants in part Toyota's Motion on other grounds, the Court does not reach this issue. The Court notes that the AMCC makes significant changes to the

named Plaintiffs' allegations with respect to actual reliance, which may moot Toyota's concerns. For these same reasons, the Court does not reach Toyota's argument that Plaintiffs lack standing under the CLRA because Plaintiffs cannot show actual causation and reliance. (Defs.' Mem. at 19–20.)

for damages on the ground that such claims are precluded as a matter of law.").

## V. *Plaintiffs' CLRA, UCL, and FAL Claims (First, Second, and Third Causes of Action)*

Plaintiffs have alleged a number of claims under California consumer protection statutes. First, they allege violations of the Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750 *et seq.* Second, they allege unfair, deceptive, and unlawful business practices in violation of the Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200 *et seq.* Third, they allege violations of the False Advertising Law ("FAL"), California Business & Professions Code §§ 17500 *et seq.* The Court examines each cause of action in turn.

### A. *Heightened Pleading Standard Under Rule 9(b)*

Although these claims arise under state law, Plaintiffs' allegations must be pled according to the Federal Rules of Civil Procedure. As a threshold matter, the parties do not dispute that claims sounding in fraud[17] are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1122 (9th Cir.2009) (applying Rule 9(b) standard to UCL and CLRA

claims); *Vess v. Ciba–Geigy Corp., USA*, 317 F.3d 1097, 1103–04 (9th Cir.2003) (where plaintiff identifies fraudulent course of conduct as basis for claim, pleading must satisfy particularity requirement).

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), allegations of fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Namely, allegations of fraud "must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). A plaintiff must allege particular facts explaining the circumstances of the fraud, "including time, place, persons, statements made[,] and an explanation of how or why such statements are false or misleading." *Baggett v. Hewlett–Packard Co.*, 582 F.Supp.2d 1261, 1265 (C.D.Cal.2007). The circumstances of the alleged fraud must be specific enough "to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106 (internal quotation marks omitted).

Under Rule 9(b), a plaintiff must plead each of the elements of a fraud claim with particularity, i.e., a plaintiff "must set forth *more* than the neutral facts necessary to

---

**17.** Plaintiffs argue merely in passing that their claims do not sound in fraud. They argue they have not alleged a fraudulent course of conduct because Toyota "negligently designed, manufactured, sold and/or marketed the Defective Vehicles" and "Toyota should have monitored NHTSA's consumer safety database for indications of changing patterns in the complaints by model with ETCS." (Pltfs.' Opp'n Brief at 25, citing to ¶¶ 123, 245.)

The Court acknowledges that fraud is not a necessary element of a UCL or a CLRA claim. *Vess v. Ciba–Geigy Corp.*, 317 F.3d 1097, 1103 (9th Cir.2003); *see also Shin v. BMW of North America*, No. 09–00398, 2009 WL 2163509, at

*11 (C.D.Cal. July 16, 2009) (finding that "plaintiffs are not required to plead 'reliance' and 'materiality' with particularity because those elements are distinct from the common law fraud element of 'justifiable reliance.' "). However, when a plaintiff alleges fraudulent conduct and relies on that conduct as the basis of a claim, the claim is "grounded in fraud." *Vess*, 317 F.3d at 1103–04. Plaintiffs allege that Toyota represented that its cars were safe when in fact they allegedly contain a defect known to Toyota that causes SUA. Therefore, fraud is an essential element of the claims at issue here, and Plaintiffs must plead under Rule 9(b).

identify the transaction." *Cooper v. Pickett*, 137 F.3d 616, 625 (9th Cir.1997) (emphasis in original). Fraud claims must be accompanied by the "who, what, when, where, and how" of the fraudulent conduct charged. *Vess*, 317 F.3d at 1106. A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.1989). The Court now turns to the parties' arguments about whether the MCC meets the 9(b) standard.

### 1. *Generalized Statements*

Toyota argues that Plaintiffs' FAL, CLRA, and a portion of the alleged "fraud" theory under the UCL fail to meet Rule 9(b)'s heightened pleading standard. (Defs.' Mem. at 20–21.) Toyota represents that Plaintiffs fail to identify a common defect or malfunction in the ETCS that Toyota knew about and knowingly concealed. (*Id.*) Toyota also claims that Plaintiffs' allegations indicated "only that Toyota's and others' investigations of a handful of *alleged* [S]UA incidents or engine surging were inconclusive" and that Plaintiffs may not, under Rule 9(b) "speculate about potential defects" and "claim that Toyota committed fraud by failing to disclose a product defect that is utterly undefined." (*Id.* at 22 (emphasis in original).)

Toyota argues that the facts in the MCC are similar to those in cases in which courts have dismissed fraud claims for failure to plead according to Rule 9(b). In *Kearns*, 567 F.3d at 1126, the Ninth Circuit affirmed the district court's decision to grant a motion to dismiss where plaintiff "fail[ed] to specify what the television advertisements or other sales material specifically stated." Toyota also urges the Court to follow the decisions of district courts granting motions to dismiss on 9(b) grounds. *See, e.g., Hovsepian v. Apple,*

*Inc.*, No. 08–578, 2009 WL 5069144, at \*3 (N.D.Cal. Dec. 17, 2009) ("operative pleading makes conclusory statements as to Apple's course of conduct" ... "[s]uch generalized allegations do not provide the 'who, what, when, where, and how' of the misconduct charged."); *Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 974 (N.D.Cal.2008) (granting motion to dismiss where plaintiff provided "no specific statement or absolute characteristic" regarding products).

### 2. *Specific Defect Allegations*

Plaintiffs allege numerous facts to support a fraudulent course of conduct underlying these three consumer protection claims. They allege both an SUA defect (*see, e.g.*, ¶¶ 119–29; 150; 165; 229) and a fail-safe defect (¶¶ 18–19; 245–46). Plaintiffs have alleged that beginning in 1996, Toyota had a commitment to "overall safety gains" and that Toyota told the public that "building safe automobiles is the most important thing we can do." (¶ 82.) Plaintiffs allege that Toyota made representations in 1998 and 2002 that "safety and security of driver and passenger has always been an absolute priority for Lexus" and that Lexus was "raising the standards on standard safety features." (¶¶ 83, 84.) Plaintiffs also allege that Toyota marketed other car models, such as the Toyota Camry, Prius, and Sienna, through advertisements, brochures, and press kits that claimed the vehicles included safety features such as the ETCS and were "more safe[ ]." (¶¶ 84, 88, 90, 91.)

Plaintiffs allege that Toyota had a "general promise of safety and specific promise that the new electronic components being installed in the Defective Vehicles are more reliable than their mechanical predecessors." (¶ 92) (alleging Toyota issued press releases stating that Toyota vehicles used technological innovations to "deliver a high level of occupant safety"; Lexus "de-

liver[s] real benefits to owners in terms of safety"; Toyota SUVs "raise the standard"; Toyota customers "have long counted on the brand for the best in performance quality and durability"; Toyota is "obsessed with safety" and "serious about safety."). Plaintiffs also allege that Toyota issued brochures discussing the safety features of various vehicle models, such as Sienna, RAV4, 4Runner, Land Cruiser, and Sequoia SUVs. (¶¶ 94–98) ("equipped with more safety features"; "more safety"; "same level of advanced safety technology"; "customer [has] peace of mind when purchasing and driving").[18] Plaintiffs have thus explained *who* made the representations, *where* and *when* they were made, and *what* the representations are.

Plaintiffs allege that Toyota's representations concerning safety were "false and misleading" because Toyota failed to disclose the SUA defect. (¶ 93; *see also* ¶¶ 6–7 (increase in SUA events within first year of changing from non-ETCS to ETCS); ¶¶ 119–29 (increase in SUA complaints after Toyota introduced ETCS-i); ¶ 150 (Toyota technicians replicated SUA events without "driver error"); ¶ 229 (SUA incident caused by deviations with ETCS); ¶¶ 225–45 (summary of defects).) Plaintiffs have therefore alleged *why* Toyota's statements were false and misleading and have thus met the specificity requirement under Rule 9(b).

Thus, it is clear that Rule 9(b) applies to the allegations under the CLRA, the fraud prong of the UCL, and the FAL. As to each of these claims, Plaintiffs have set forth factual allegations that meet the appropriate pleading standard. Plaintiffs have alleged the "who" (Toyota), the "what" (representations that Toyota vehicles are safe); the "where" and "when" (representations were allegedly made in magazine advertisements, press kits, and brochures), and the "why" (Toyota vehicles have a defect that causes SUA). Thus, the FAL, CLRA, and UCL (fraud theory) allegations are properly pled under Rule 9(b).

**B. *CLRA Claims***

Plaintiffs' first cause of action is for violations of the CLRA. The CLRA forbids "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ.Code § 1770(a). A fraudulent omission is actionable under the CLRA if the omission is "of a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty v. American Honda Motor Co.*, 144 Cal.App.4th 824, 835, 51 Cal.Rptr.3d 118 (2006). To allege a duty to disclose, a plaintiff must show that the defendant (1) is in a fiduciary relationship with the plaintiff; (2) had exclusive knowledge of material facts not known to the plaintiff; (3) actively conceals a material fact from the plaintiff; or (4) makes partial representations but also

---

18. The Court notes that none of the Plaintiffs appear to allege that they relied on specific advertising by Toyota in purchasing or leasing their cars. Instead, Plaintiffs allege generally that "in purchasing or leasing their vehicles, the Plaintiffs relied on the misrepresentations and/or omissions of Toyota with respect of the safety and reliability of the vehicles." (¶ 327.) In its brief, Toyota focuses on the lack of an alleged defect, and does not appear to argue that a 9(b) issue exists as to whether Plaintiffs relied on Toyota's representations. Allegations of representations from product labels and statements that, had consumers not been deceived by the labels, they would not have purchased the product, are sufficient to plead under Rule 9(b). *Von Koenig*, 713 F.Supp.2d at 1077–78. The Court expresses no opinion about the reliance issue as it pertains to Rule 9(b) and believes that Plaintiffs may have provided more specificity in their First Amended Master Consolidated Complaint.

suppresses some material fact. *LiMandri v. Judkins,* 52 Cal.App.4th 326, 336, 60 Cal.Rptr.2d 539 (1997).

Plaintiffs have pled a failure to disclose a defect under the second and third *LiMandri* factors. They allege that Toyota "fail[ed] to disclose and actively conceal[ed] the dangerous risk of throttle control failure and the lack of adequate failsafe mechanisms," thus engaging in five deceptive business practices:

(1) representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have,

(2) representing that Defective Vehicles are of a particular standard, quality, and grade when they are not,

(3) advertising Defective Vehicles with the intent not to sell them as advertised,

(4) representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and

(5) representing that the subject of a transaction involving Defective Vehicles has been supplied in accordance with a previous representation when it has not.

(¶ 300.)

### 1. *Material Facts*

To plead a duty to disclose, Plaintiffs must show the nondisclosed facts are material. Nondisclosures about safety considerations of consumer products are material. *Falk v. General Motors Corp.,* 496 F.Supp.2d 1088, 1096 (N.D.Cal.2007). Toyota argues that Plaintiffs' allegations under the CLRA "are deficient because they do not identify *any* specific material facts ... that Toyota had a duty to disclose." (Defs.' Mem. at 25 (emphasis in the original).) Toyota argues that "material statements about the safety and reliability" of the vehicles are not "material facts that give rise to a duty to disclose." (*Id.*) Moreover, Toyota argues that Plaintiffs' allegations are deficient because they do not identify a defect. (*Id.*) Additionally, Toyota argues that "generalized statements" of material facts are insufficient, citing to *Oestreicher,* 544 F.Supp.2d at 971–72 n. 1 (N.D.Cal.2008) and *Tietsworth v. Sears, Roebuck & Co.,* 09–CV–00288, 2009 WL 3320486, at *4 (N.D.Cal. Oct. 13, 2009).

Those cases are factually distinguishable. In *Oestreicher,* the court found that the plaintiff had not made any showing about safety considerations, and declined to find material facts that the defendant was obligated to disclose. Thus, allegations about safety *are* material. In *Tietsworth,* unlike here, the court recognized that the plaintiffs had alleged *no* representations about the defective product and found no duty to disclose. Here, Plaintiffs have alleged that Toyota's nondisclosure of the vehicles' "propensity ... to accelerate suddenly and dangerously out of the driver's control ... are material to the reasonable consumer." (¶¶ 33, 34, 39, 40, 42, 45, 49, 51, 52, 54, 55, 59, 60, 62, 64, 67, 69) (examples of unintended acceleration and alleging accidents and damage from SUA); ¶ 305 ("[w]hether or not a vehicle (a) accelerates only when commanded to do so and (b) decelerates and stops when commanded to do so are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.").

The Court is convinced that a safety consideration as fundamental as whether a car is able to stop when the brakes are applied is material to consumers. *See Falk,* 496 F.Supp.2d at 1096 (a reasonable consumer "would expect the speedometer to read the speed accurately. Otherwise consumers would travel at unsafe speeds and possibly incur moving-violation penalties."). Here, the nondisclosure of the defect is equally, if not more, serious, because consumers have been unable to stop their vehicles. (¶¶ 301–02.) Plaintiffs al-

lege that Toyota made material statements about the safety and reliability of Defective Vehicles that were "either false or misleading," and each of these statements "contributed to the deceptive context" of Toyota's "unlawful advertising and representations as a whole." (*Id.*) Thus, Plaintiffs allege that SUA is material to consumers.

### 2. *Exclusive Knowledge and Active Concealment*

■ Plaintiffs establish a duty to disclose because they allege that Toyota has superior knowledge of the SUA defects. (*See, e.g.,* ¶¶ 119–29, 131, 149–50, 160–61, 213, 303, 398 (consumers' reports to dealerships).) Plaintiffs allege that beginning in 2002, Toyota had exclusive knowledge of an SUA defect and knew about the material safety considerations through its own testing, dealership repair orders, and various other sources. (*See, e.g.,* ¶¶ 113–16 (first reports of unintended acceleration); ¶ 149 (disclosure of portion of consumer complaints to regulators). Plaintiffs also allege that Toyota actively concealed complaints from consumers and the "true root cause of SUA." (¶¶ 170; 196–218).) As discussed in greater detail with respect to the fraudulent concealment allegations below, Plaintiffs have sufficiently alleged that Toyota had exclusive knowledge of material facts not known to Plaintiffs and actively concealed those facts. Plaintiffs sufficiently allege a duty to disclose, and therefore they have a viable CLRA claim.

### 3. *Damages*

■ A plaintiff seeking damages under the CLRA must provide notice to the defendant under California Civil Code § 1782(a).[19] That section provides that at least thirty days prior to commencing an action for damages under the CLRA, the consumer must (1) notify the person alleged to have committed violations, and (2) demand that the person "correct, repair, replace, or otherwise rectify the goods or services" alleged to be in violation. Cal. Civ.Code § 1782(a). Notice "shall be in writing and shall be sent by certified or registered mail, return receipt requested," to the place where the transaction occurred or to the person's principal place of business within California. *Id.*

The purpose of the notice requirement is to "give the manufacturer or vendor sufficient notice of alleged defects to permit appropriate corrections or replacements," and the "clear intent . . . is to provide and facilitate precomplaint settlements of consumer actions wherever possible and to establish a limited period during which such settlement may be accomplished." *Outboard Marine Corp. v. Superior Court,* 52 Cal.App.3d 30, 41, 124 Cal.Rptr. 852 (1975). A "literal application of the notice provisions" is the "only way" to accomplish the CLRA's purposes. *Keilholtz v. Superior Fireplace Co.,* No. 08–00836, 2009 WL 839076, at *3 (N.D.Cal. March 30, 2009) (citing *Outboard Marine, supra.*)

Toyota argues that Plaintiffs did not meet the notice requirements because the CLRA notices were sent on behalf of Plaintiffs who are not named as class representatives. (Def.'s Mem. 27.) Toyota argues that "the majority of named Plaintiffs have failed to establish proper notice to Toyota." (*Id.*) Toyota asks the Court to strike the damages request.

Plaintiffs argue that Toyota was put on notice of its violations of the CLRA more than thirty days before the MCC was filed, and that "[n]othing more is required." (Pl's Opp'n Br. 24.) Plaintiffs allege that they sent notice in compliance with § 1782

---

**19.** Toyota has requested this Court strike Plaintiffs' request for actual and statutory damages and punitive damages pursuant to the CLRA violation. (Defs.' Mot. to Strike at 1 (citing ¶¶ 310–12).)

as early as November 24, 2009 and that other notices were sent on March 23, 2010, and June 4, 2010. (¶ 309.) During the hearing, Plaintiff's counsel referred the Court to the letter sent to TMS by eleven Consumer Plaintiffs on June 4, 2010 ("June 4 letter"). (Gilford Decl., Ex. E.) In that letter, the group of Plaintiffs stated, on behalf of a putative class, that they believed TMS had engaged in acts in violation of the CLRA and demanded that Toyota "halt such unfair trade practices and make [ ] remedies on a classwide basis." (Gilford Decl., Ex. E, at 2.) The Court now agrees with Plaintiffs, and finds that the June 4 letter is sufficient to comply with the notice requirement. That letter fulfills the purpose of § 1782(a) to facilitate settlement and provide an opportunity for the manufacturer to fix alleged defects.

During the hearing, the Court also queried whether one or more persons could meet the CLRA notice requirements on behalf of the putative class. The Court is satisfied that a group of named plaintiffs, such as those who wrote the June 4 letter, satisfy the notice requirements on behalf of the putative class. *Kagan v. Gibraltar Sav. & Loan Ass'n,* 35 Cal.3d 582, 595, 200 Cal.Rptr. 38, 676 P.2d 1060 (1984) (disapproved on other grounds) (class action may begin thirty days after demand on behalf of class).

Therefore, the Court denies the Motion to Strike the CLRA damages claim in the MCC. (¶¶ 310–11.)

C. *UCL Claims*

[redacted] The UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. A plaintiff may pursue a UCL claim under any or all of three theories: the "unlawfulness," "fraudulent," or "unfairness" prongs. *South Bay Chevrolet v. General Motors Acceptance Corp.,* 72 Cal.App.4th 861, 878, 85 Cal.Rptr.2d 301 (1999). Plaintiffs have pursued all three, and Toyota does not contest this in its Motion or Reply briefs.

[redacted] Plaintiffs have set forth sufficient factual allegations under all three prongs. First, the UCL prohibits "unlawful" practices that are forbidden by any law. *Saunders v. Superior Court,* 27 Cal. App.4th 832, 838, 33 Cal.Rptr.2d 438 (1994). The statute "borrows" violations of other laws and treats them as actionable. *Cel–Tech Commc'ns v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Plaintiffs allege a violation of the CLRA and the National Traffic and Motor Vehicle Safety Act of 1996, 49 U.S.C. § 30101 *et seq.* (¶¶ 318, 319, 320–24.) These allegations are sufficient to establish "unlawful" conduct in violation of the UCL.

[redacted] Second, a fraudulent business practice is one that is likely to deceive the public and may be based on representations that are untrue. *McKell v. Washington Mut., Inc.,* 142 Cal.App.4th 1457, 1471, 49 Cal.Rptr.3d 227 (2006). Plaintiffs allege that Toyota misrepresented the safety of its vehicles and failed to disclose SUA defects. (¶ 325.) As shown above, Toyota represented that its vehicles were safe when in fact Plaintiffs allege that they are not. This is sufficient to show that members of the public are "likely to be deceived" and establishes a violation under the fraudulent prong.

[redacted] Lastly, Plaintiffs state a claim under the unfairness prong. "Unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel–Tech Commc'ns,* 20 Cal.4th at

187, 83 Cal.Rptr.2d 548, 973 P.2d 527. Plaintiffs allege that Toyota committed a violation of this prong because "the manufacture and sale of vehicles with a sudden acceleration defect that lack a brake-override or other effective fail-safe mechanism, and defendants' failure to adequately investigate, disclose, and remedy, offend established public policy." (¶ 326.)

Plaintiffs' allegations are sufficient under all three prongs.

### D. *FAL Claims*

■ Section 17500 prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services. Cal. Bus. & Prof.Code § 17500. To state a claim for an FAL violation, Plaintiffs must allege that "members of the public are likely to be deceived." *In re Tobacco II*, 46 Cal.4th at 312, 93 Cal.Rptr.3d 559, 207 P.3d 20. Toyota claims that it is "well-established that generalized statements asserting claims of quality and safety are non-actionable," and cites to two cases for support. (Defs.' Mem. at 23 (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1015 (9th Cir.2003) (statements describing "high priority" that company placed on product development and marketing efforts were "mere puffery" upon which reasonable consumer could not rely); *Stearns v. Select Comfort Retail Corp.*, No. 8–2746, 2009 WL 1635931, at *16–17 (N.D.Cal. June 5, 2009) (statement promising "perfect night's sleep" was non-actionable "generalized and vague statement of product superiority")).)[20]

This is not an accurate statement of the law. Neither of these cases stands for the proposition that Defendants who make safety representations cannot be liable for FAL claims. Instead, these cases present instances when representations about product development and product superiority were not actionable. That is not the case here. Toyota argues that representations it allegedly made in press releases, annual reports, brochures and the like are "generalized statements concerning the quality and safety of Toyota vehicles." (Defs.' Mem. at 23.) Toyota argues that these statements are not actionable because they are not likely to deceive a reasonable consumer. Toyota is not correct.

■ The Ninth Circuit has recognized that "misdescriptions" of specific or absolute characteristics of products are actionable. *Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 246 (9th Cir.1990). The court recognized that advertising which "merely states in general terms that one product is superior is not actionable," and found that the claims at issue—"we're the low cost commercial collection experts"—were "general assertions of superiority rather than factual misrepresentations." *Id.* Advertisements that make representations about safety are actionable. *See, e.g., Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal.App.3d 388, 424, 264 Cal.Rptr. 779 (1989) (representations in brochures "were not statements of 'opinion' or mere 'puffing'").

■ Plaintiffs allege sufficient facts about the ETCS-i system to state a claim for violation of the FAL. Plaintiffs allege that Toyota "caused to be made or dissem-

---

**20.** Toyota also cites to *Cirulli v. Hyundai Motor Co.*, No. 08–0854, 2009 WL 5788762, *3 (C.D.Cal. June 12, 2009), for the proposition that safety representations are not always actionable. (Defs.' Reply at 9.) In that case, the court analyzed statements in the context of a fraudulent misrepresentation claim, and granted the motion to dismiss the FAL claim because no opposition was filed. *Cirulli, supra,* at *3, *5. The Court finds this case is not instructive as to the present FAL claim.

inated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading." (¶ 333.) Plaintiffs allege that the misrepresentations and omissions were likely to deceive a reasonable consumer. (¶ 334.) Plaintiffs also allege Toyota made "specific misdescriptions" of its vehicles. (Pltfs.' Opp'n Brief at 31, citing *e.g.*, ¶ 89 (alleging that ETCS makes it possible to achieve "shorter activation times" leading reasonable consumers to "believe that their brakes would activate more quickly than usual rather than potentially not at all.").)

Such a statement stands in stark contrast to Toyota's selective quotation and characterization of the allegations in the MCC as statements of "product superiority." (Defs.' Mem. at 24, citing to *Fraker v. KFC Corp.*, No. 06–01284, 2007 WL 1296571, at *2–3 (S.D.Cal. Apr. 30, 2007). In *Fraker*,) the court dismissed an FAL claim because "no reasonable consumer" would rely upon claims that the KFC Corporation provides the "best food" and that "all foods can fit into a balanced eating plan" as the basis of an actionable claim. *Id.* at *3. Here, however, the allegations about product safety are more than "mere puffery" that Toyota's cars were superior to others. They constitute a campaign by Toyota in which it represented itself as prioritizing (even "obsessing over") safety. Accordingly, the Court denies Toyota's motion to dismiss the FAL claim.

### E. *Motion to Strike CLRA and UCL Claims*

Toyota moves to strike language in the section of the MCC seeking damages for alleged CLRA violations, namely paragraphs 310, 311, and 312, as well as the words "punitive damages" from paragraph 314. (Defs.' Mem. at 1.) Toyota also moves to strike the UCL allegations in paragraphs 318, 325, and 326 from the MCC.

Toyota's motion is denied. The Court finds that the damages sought under paragraphs 310 and 311 are viable because Plaintiffs meet the notice requirements under California Civil Code § 1782(a). Moreover, the Court finds that the punitive damages allegations in paragraph 312 are sufficient and Toyota has not provided a reason to strike them. Finally, Toyota has provided no reason to strike the three allegations of violations of each prong of the UCL. Therefore, the Court declines to strike them.

### VI. *Express and Implied Warranties (Fourth and Fifth Causes of Action)*

Defendants move to dismiss Plaintiffs' express and implied warranty claims based on a number of theories. Plaintiffs' opposition reveals that they based their express warranty claims not only on the written manufacturer's warranty but also upon numerous statements made by Defendants in the marketing of Toyota vehicles.

### A. *Express Written Warranty*

#### 1. *Terms*

Toyota's written warranty provides:

WHAT IS COVERED AND HOW LONG Basic Warranty: This warranty covers repairs and adjustments needed to correct defects in material or workmanship of any part supplied by Toyota, subject to the exceptions indicated under "What is Not Covered" on pages 13–14.

(*See, e.g.*, Gilford Decl., Ex. B, Warranty Manuals, at 25.) The written warranty limits the remedy available to "necessary repairs or adjustments":

Limitations: The performance of necessary repairs and adjustments is the exclusive remedy under these warranties or any implied warranties.

(*See e.g., id.* at 24.) To receive service under the warranty, purchasers must seek assistance from Toyota's dealers: (*See, e.g., id.* at 44 ("To obtain warranty service in the United States, . . . take your vehicle to an authorized Toyota dealership.").)

### 2. *Limited Remedy of Repair or Adjustment*

■ Defendants contend that to the extent that Plaintiffs assert claims that seek remedies beyond repair or replacement, these claims are barred by the terms of the written warranty. Defendants correctly observe that this limitation is consistent with the Uniform Commercial Code ("UCC") § 2–719(1)(a). *See* Cal. Com.Code § 2719(1)(a) (California's version of the UCC § 2–719(1)(a)) ("The agreement . . . may limit or alter the measure of damages recoverable under this division, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts . . . .").

Here, however, the limitation on the remedy found in the written warranty must be viewed through the lens of Plaintiffs' theory of the alleged defects. Plaintiffs allege there are defects in the Toyota vehicles that Toyota is unable or unwilling to repair, and that the two wide-scale recalls failed to repair the defect. (*See* ¶ 24.) Accepting this fact as true, as the Court must at the pleadings stage, Plaintiffs have stated a claim for breach of express written warranty, which includes any Plaintiff (1) whose vehicle was taken during its warranty period for repair pursuant to the recalls, and (2) who has alleged he or she sought repair during the vehicle's warranty period for SUA-related issues, and was informed either that the vehicle had been repaired or that nothing was wrong with the vehicle. The essence of Plaintiffs' allegations regarding repairs is that, with respect to any SUA-related repair request,

any purported repair was itself defective because no adequate brake-override system was installed and/or because the repairs pursuant to the floor mat and pedal recalls did not address the root cause of the SUA events. (*See* ¶¶ 17–18.) At the pleadings stage, such allegations are sufficient to fall within the scope of the "repair or adjustment" warranty limitation.

### 3. *Requirement of Presentment for Repair Within the Warranty Period and Requirement of Notice Before Filing Suit*

#### a. *Contractual Requirement of Presentment for Repair Within the Warranty Period*

■ As noted above, Plaintiffs who sought repairs pursuant to the recalls or who sought repairs for SUA-related issues have stated a claim for breach of express warranty based on the written warranty. The question remains, however, whether those Plaintiffs who are outside those two presumably overlapping groups have met the requirement that they take their vehicles to a dealer for repair (or are excused from that requirement) such that they, too, have stated a claim for breach of express warranty.

Plaintiffs argue they should be excused from seeking repair within the stated warranty period in the manner specified in the warranty because the defect alleged here is latent. This issue must be resolved by the Court's reconciliation of two seemingly conflicting California Court of Appeal decisions in the manner the California Supreme Court would reconcile the two. *See S.D. Myers, Inc. v. City & County of San Francisco,* 253 F.3d 461, 473 (9th Cir.2001) ("[W]hen state law applies to an issue, federal courts must interpret and apply state law as would the highest state court.").

In Plaintiffs' favor is *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal.App.4th 908, 923, 107 Cal.Rptr.2d 761 (2001), which suggests that the limitation on repair warranties does not apply when the product is inherently defective at the time of delivery. There, the court noted that if the Plaintiffs could prove that the allegedly defective product was "substantially certain to result in malfunction during the useful life of the product," they could prevail on their warranty claim notwithstanding the fact that the defect had not manifested itself as of the time of the filing of the action. *Id.*

In Defendants' favor is *Daugherty*, 144 Cal.App.4th at 830, 51 Cal.Rptr.3d 118 (2006), which considered a motor vehicle warranty similar to the one at issue here. In considering claims by a number of Plaintiffs based on the "3 year or 36,000 mile" written warranty where no defects were discovered during the warranty period, the court rejected the argument that the warranty covered undiscovered defects where it was alleged the manufacturer was aware of the defect when the vehicle was sold. *Id.* at 832, 51 Cal.Rptr.3d 118 ("We agree with the trial court that, as a matter of law, in giving its promise to repair or replace any part that was defective in material or workmanship and stating the car was covered for three years or 36,000 miles, Honda did not agree, and Plaintiffs did not understand it to agree, to repair latent defects that lead to a malfunction after the term of the warranty.") (internal quotation marks omitted).

In reconciling conflicting appellate decisions applying state law, a district court must attempt to "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *S.D. Myers, Inc.*, 253 F.3d at 473 (internal quotation marks and citation omitted). Here, however, such reference is not required because a closer examination of *Hicks* reveals it is not inconsistent with *Daugherty* as applied to the facts alleged in the present case.

As the *Hicks* court expressly recognized, its analysis was shaped by the unique nature of the product that was alleged to be defective: A product used in the construction of home concrete slab foundations that was alleged to have compromised the foundation's structural integrity. *Hicks,* 89 Cal.App.4th at 912, 923, 107 Cal.Rptr.2d 761. The court expressly distinguished the product from motor vehicles and tires based on the length of useful life. *Id.* at 923, 107 Cal.Rptr.2d 761. Of foundations, the court noted that "[a] foundation's useful life ... is indefinite," while "cars and tires" with their "limited useful life," will often "wind up on a scrap heap" with "whatever defect they may have contained." *Id.* Thus, the *Hicks* decision does not support Plaintiffs' argument that it should be applied to excuse the failure to seek repair of the vehicles at issue here during the warranty period.

Another district court case has made similar observations regarding the effect of *Daugherty* and *Hicks*. See *Tietsworth,* 720 F.Supp.2d at 1141 (expressing concern that a holding contrary to *Daugherty* "would eviscerate any limitations put in place by an express warranty," and noting that *Hicks* does not permit a Plaintiff to assert a claim for breach of express written warranty based on a latent defect that does not "result in product failure during the warranty period") (internal quotation marks and citations omitted).

Thus, Plaintiffs who neither sought repairs pursuant to the recalls nor sought repairs for SUA-related issues may not pursue a claim for breach of express warranty based on the written warranty.

#### b. *Statutory Requirement of Notice Before Filing Suit*

■ Relatedly, Cal. Com.Code § 2607(3)(A) requires pre-suit notice be given to a seller of goods: "The buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy ...." *Id.* Defendants contend that, pursuant to § 2607(3)(A), Plaintiffs who failed to give Defendants the required pre-suit notice are barred from seeking any remedy.

Except as to those relatively few Plaintiffs (such as at least one non-consumer Plaintiff) who allege they purchased their vehicles directly from Defendants, this requirement is excused as to a manufacturer with which the purchaser did not deal. *See Greenman v. Yuba Power Prods.*, 59 Cal.2d 57, 61, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) (notice not required in action against a manufacturer and by purchasers "against [a] manufacturer[] with whom they have not dealt."). The principle enunciated by the California Supreme Court in *Greenman* has been recently applied by federal district courts. *See e.g., Aaronson v. Vital Pharmaceuticals, Inc.*, No. 09–CV–1333 W(CAB), 2010 WL 625337, at *5 (S.D.Cal. Feb. 17, 2010) (denying motion to dismiss for failure to give § 2607(3)(A) notice); *cf. Sanders v. Apple Inc.*, 672 F.Supp.2d 978, 988–89 (2009) (noting the *Greenman* exception to the notice requirement but nevertheless dismissing a claim for failure to give notice to

the manufacturer where an electronic device was purchased directly from the manufacturer's online store).

Plaintiffs who allege they purchased their vehicle directly from Defendants are subject to the notice requirement. Notice may be given consistent with *Hampton v. Gebhardt's Chili Powder Co.*, 294 F.2d 172, 174 (9th Cir.1961),[21] which permits post-filing notice if notice is otherwise within a reasonable time, and Plaintiffs are granted leave to amend to allege such notice.

#### 4. *Design Defect as Beyond the Scope of "Materials and Workmanship"*

Defendants contend Plaintiffs' express warranty claim based on the written warranty fails because they claim a design defect and the written warranty applies only to defects in "materials and workmanship." Plaintiffs fail to oppose this argument, which the Court nevertheless considers it on its merits.

The Court has been unable to locate any California state appellate case that answers this question on point. However, another district court case has addressed the question, and that court's decision is based on a relevant distinction in California products liability law.

Specifically, in *Brothers v. Hewlett-Packard Co.*, No. C–06–2254 RMW, 2007 WL 485979, at *4 (N.D.Cal. Feb. 12, 2007), the court rejected a breach of express written warranty claim based on an alleged design defect where the warranty guaranteed against defects in "materials

---

**21.** *Hampton* was decided under the provision of the Uniform Sales Act that parallels the Uniform Commercial Code § 2–607(3)(A). The substance of the two provisions are indistinguishable. *Compare* Cal. Civ.Code § 1769 (repealed 1963) ("In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale.

But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor.") *with* Cal. Civ.Code § 2607(3)(A) ("The buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy ....").

and workmanship." *Id.* at *4. In differentiating between design defects and defects in materials and workmanship, the Court relied on *McCabe v. Am. Honda Motor Co.,* 100 Cal.App.4th 1111, 1120, 123 Cal. Rptr.2d 303 (2002), which, in turn, drew a distinction between the two terms based on California products liability law. *See Brothers,* 2007 WL 485979 at *4.

In *McCabe,* a the California Court of Appeal distinguished between a design defect and "manufacturing defects":

California recognizes two distinct categories of product defects: manufacturing defects and design defects.... A manufacturing defect exists when an item is produced in a substandard condition.... Such a defect is often demonstrated by showing the product performed differently from other ostensibly identical units of the same product line.... A design defect, in contrast, exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective.

*McCabe,* 100 Cal.App.4th at 1119–20, 123 Cal.Rptr.2d 303 (internal citations omitted) (paragraph structure altered).

The Court agrees with the *Brothers* court that an express written warranty covering "materials and workmanship" does not include design defects. As articulated by the *McCabe* court, defects in design are of a wholly different character than those occurring in the manufacturing process, whether because the materials used were defective or because materials were assembled in a shoddy or otherwise improper manner. Thus, Plaintiffs may not base their express written warranty claims on an alleged design defect.

Nevertheless, although the Court concludes that claims based on a design defect are outside of the scope of the express written warranty that guarantees "materials and workmanship," the Court does not

agree with Defendants' assessment that Plaintiffs' claims are based solely on alleged design defects. Specifically, Plaintiffs allege: "The failure to design, *assemble and manufacture* the ETCS-i wiring harnesses in such a way as to prevent mechanical and environmental stresses from causing various shorts and faults, including resistive faults which, in turn, sometimes cause sensor outputs consistent with a request by the driver to fully open the throttle ...." (¶ 245(1)(h) (emphasis added)). Thus, to the extent that Plaintiffs' breach of express warranty claim is based on allegations other than design defects, they are not barred as beyond the scope of the warranty on "materials and workmanship."

### 5. *Unconscionability*

Plaintiffs make allegations in the MCC that suggest they seek to avoid the limitations of the express written warranty on the basis of unconscionability. (*See* ¶¶ 347–48, 351–52.) Plaintiffs do not address Defendants' arguments regarding unconscionability.

The law of contractual unconscionability is well established in California, and requires both procedural and substantive unconscionability:

[U]nconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results. The prevailing view is that procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.... But they need not be present in the same degree. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in

proportion to the greater harshness or unreasonableness of the substantive terms themselves.... In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.

*Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 114, 99 Cal. Rptr.2d 745, 6 P.3d 669 (2000) (internal alteration marks, quotation marks, and citations omitted).

Plaintiffs allege that the warranties were offered on a "take-it-or-leave-it" basis, resulting in a contract of adhesion, which tends toward procedural unconscionability. (*See* ¶ 348.) However, "a contract of adhesion is fully enforceable according to its terms unless certain other factors are present which ... operate to render it otherwise." *Graham v. Scissor–Tail, Inc.,* 28 Cal.3d 807, 819–20, 171 Cal.Rptr. 604, 623 P.2d 165 (1990) (per curiam) (internal citations omitted).

Looking at the terms of the express written warranties, and in the absence of argument by Plaintiffs to the contrary, the Court discerns no substantive unconscionable terms. In the absence of any substantive unconscionability, Plaintiffs cannot avoid the terms of the express written warranty on the basis of unconscionability.

### B. *Express Warranty Created by Representations in Advertisements*

■ Plaintiffs contend that, in addition to the express written warranty, Defendants extended an additional warranty by virtue of its statements regarding the safety and performance of their vehicles. This claim is based on Cal. Com.Code § 2313:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

*Id.*

To create a warranty, representations regarding a product must be specific and unequivocal. *See Johnson v. Mitsubishi Digital Elecs. Am., Inc.,* 578 F.Supp.2d 1229, 1236 (C.D.Cal.2008) (stating that to create an express warranty, the seller must make representations or promises with sufficient specificity); *Keith v. Buchanan,* 173 Cal.App.3d 13, 21, 220 Cal. Rptr. 392 (1985) (setting forth factors to consider regarding whether a statement creates a warranty, including amount of specificity and lack of equivocalness).

The Court finds that the statements alleged, when inferences are viewed in favor of Plaintiffs, are sufficiently specific and unequivocal. The thrust of Defendants' statements is that Toyota vehicles are safe; more specifically, their statements convey that Defendants' use of advanced technology in their vehicles, including ETCS, enhances safety. Plaintiffs' allegations, if proven, represent the antithesis of these statements: ETCS (and/or some other unidentified defect) has resulted in dangerous SUA events. *See supra* section V.A.2.

Nevertheless, Plaintiffs cannot base a claim on this warranty in the absence of allegations that they were exposed to them. Defendants argue that these statements did not create any express warranty because they were not a "basis of the bargain" as required by § 2313. Plaintiffs allege merely that Defendants' statements "were made ... in advertisements, in Toyota's 'e-brochures,' and in uniform statements provided by Toyota to be made by salespeople." (¶ 345.) Conspicuously ab-

sent from their allegations is that they heard or read these statements or that the statements were otherwise disseminated to them.[22] California law does not permit Plaintiffs, in the absence of specific allegations that they were aware of the statements made in a national advertising campaign, to base their express warranty claims on statements made in that national advertising campaign. *See Osborne v. Subaru of America, Inc.*, 198 Cal.App.3d 646, 660, 243 Cal.Rptr. 815 (1988) (rejecting an argument that court could infer plaintiff's reliance on a national advertising campaign).

The authority cited by Plaintiffs does not counsel or compel a contrary conclusion. Plaintiffs rely on *Keith v. Buchanan*, 173 Cal.App.3d 13, 21–22, 220 Cal. Rptr. 392 (1985), which states unequivocally, that "[i]t is clear that statements made by a manufacturer or retailer in an advertising brochure which is disseminated to the consuming public in order to induce sales can create express warranties." *Id.* However, in *Keith*, as well as all the cases it cites in support of the quoted proposition, the record revealed that the Plaintiffs were recipients of the statements in the brochures or other sales literature. *Id.* Thus, *Keith* does not support the proposition that Plaintiffs are excused from pleading that they were exposed to the statements they allege create an express warranty. With respect to any Plaintiff not actually exposed to the advertising, the express contract claim fails.

### C. *Implied Warranty*

Plaintiff brings its claim for breach of implied warranty pursuant to Cal. Com.

Code § 2314, which sets forth the implied warranty of merchantability:

> [A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.... Goods to be merchantable must be ... fit for the ordinary purposes for which such goods are used ....

*Id.* § 2314(2)(c).

### 1. *The Requirement of Privity*

This Court has before considered the requirement of vertical privity in connection with an implied warranty of merchantability. *See Anunziato v. eMachines, Inc.*, 402 F.Supp.2d 1133, 1141 (C.D.Cal.2005). There, the Court stated:

> California recognizes the implied warranty of merchantability.... In California, a plaintiff alleging breach of warranty claims must stand in "vertical privity" with the defendant. The term "vertical privity" refers to links in the chain of distribution of goods. If the buyer and seller occupy adjoining links in the chain, they are in vertical privity with each other.... Further, if the retail buyer seeks warranty recovery against a manufacturer with whom he has no direct contractual nexus, the manufacturer would seek insulation via the vertical privity defense. Finally, there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale.

*Id.* (internal quotation marks and citations omitted); *accord, Clemens v. Daimler-Chrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir.2008) (applying California law and dis-

---

**22.** Note, however, that Plaintiffs are not required to allege reliance. *See e.g., Weinstat v. Dentsply Intern., Inc.*, 180 Cal.App.4th 1213, 1227, 103 Cal.Rptr.3d 614 (2010) ("Pre–Uniform Commercial Code law governing ex-

press warranties required the purchaser to prove reliance on specific promises made by the seller.... The Uniform Commercial Code, however, does not require such proof.") (internal citations omitted).

missing, for lack of vertical privity, claims by a purchaser against a manufacturer).

Although acknowledging the general rule that a plaintiff must be in privity with a defendant in order to assert an implied warranty claim, Plaintiffs here nonetheless argue two exceptions to the general rule, third-party beneficiary status and the sale of a dangerous instrumentality, excuse the lack of privity.[23]

### a. *Exception to Privity Requirement for Third–Party Beneficiaries*

Plaintiffs contend that they may assert their implied warranty claim notwithstanding that the are admittedly not in vertical privity with Defendants. They do so based on the argument that third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty.

The law in California on third-party beneficiaries is well established. By statute, Cal. Civ.Code § 1559, a third-party beneficiary may enforce a contract made expressly for his or her benefit. *Id.* A contract made "expressly" for a third party's benefit need not specifically name the party as the beneficiary; to be deemed a third-party beneficiary, one need only to have experienced more than an incidental benefit from the contract. *Gilbert Financial Corp. v. Steelform Contracting Co.,* 82 Cal.App.3d 65, 69, 145 Cal.Rptr. 448 (1978).

Although courts applying California law regarding the third-party beneficiary exception to the vertical privity requirement of implied warranty claims have come to differing conclusions, the clear weight of authority compels a conclusion that where plaintiffs successfully plead third-party beneficiary status, they successfully plead a breach of implied warranty claim. *Compare Gilbert,* 82 Cal.App.3d at 69, 145 Cal.Rptr. 448 (finding that a homeowner, as a third-party beneficiary of a subcontractor's warranty in favor of the contractor who performed work on a residence, could maintain a breach of implied warranty claim against subcontractor notwithstanding the lack of privity between the homeowner and the subcontractor) *and Arnold v. Dow Chemical Co.,* 91 Cal. App.4th 698, 720, 110 Cal.Rptr.2d 722 (2001) (finding, based on the fact that distributors and retailers were not intended to be the ultimate consumers, that plaintiff could maintain breach of implied warranty claim notwithstanding the lack of privity with manufacturer of pesticide) *and Cartwright v. Viking Industries, Inc.,* 249 F.R.D. 351, 356 (E.D.Cal.2008) (relying on *Gilbert* ) (concluding that plaintiffs were, as third-party beneficiaries, entitled to maintain a breach of implied warranty claim against the manufacturer where plaintiffs, not the distributors, were the intended consumers) *and In re Sony VAIO Computer Notebook Trackpad Litigation,* No. 09cv2109 BEN (RBB), 2010 WL 4262191, at *3 (S.D.Cal. Oct. 28, 2010) (holding that the facts as pled by plaintiffs—that the retailer from which they purchased defective products was manufacturer's authorized retailer and service facility—precluded dismissal of a breach of implied warranty claim for lack of privity) *with The NVIDIA GPU Liti-*

---

**23.** Plaintiffs also point out that two non-consumer Plaintiffs allege that they purchased vehicles directly from Toyota. ¶¶ 71–72, 74. To the extent any Plaintiff alleges he or she purchased vehicles directly from any Defendant, privity of contract is obviously established. However, not all the allegations to which Plaintiffs point sufficiently allege such purchases. (*Compare* ¶ 71 ("Green Spot Motors purchased a 2009 Camry from Toyota.") *with* ¶ 72 (using an ambiguous term, "direct purchases") *and* ¶ 74 (using the ambiguous term, "direct dealing ... with the [d]efendants," coupled with the legal conclusion, "so that [Plaintiff] is in privity with those [d]efendants").)

*gation,* No. C 08–04313 JW, 2009 WL 4020104, at *6–7 (N.D.Cal. Nov. 19, 2009) (finding, without elaboration, vertical privity requirement precluded breach of implied warranty claim against computer component manufacturer by purchasers of computers into which the component was incorporated because of the lack of allegations of a contract to which the computer purchasers were third-party beneficiaries).

■ Thus, the Court concludes that where a plaintiff pleads that he or she is a third-party beneficiary to a contract that gives rise to the implied warranty of merchantability, he or she may assert a claim for the implied warranty's breach. Here, Plaintiffs have pled that they purchased vehicles from a network of dealers who are agents of Defendants. (*See* ¶¶ 77–78.) Like the plaintiffs in *Gilbert, Cartwright,* and *In re Sony VAIO,* Plaintiffs allege they were the intended consumers. (*See* ¶ 363 ("The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.").) Like those plaintiffs, they allege facts tending to support that they are third-party beneficiaries; therefore, Plaintiffs' breach of implied warranty claim is not precluded by the lack of vertical privity.

Toyota's reliance on *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017 (9th Cir. 2008), a Ninth Circuit case applying California law, neither compels nor counsels a contrary result. There, the Ninth Circuit considered an implied warranty claim that a vehicle purchaser asserted against the manufacturer from which he did not directly purchase the vehicle, ultimately affirming the district court's dismissal based on the lack of vertical privity. *Id.* at 1021, 1023–24. However, the court did not consider the third-party beneficiary exception

to the vertical privity requirement. *Id.* at 1023. Instead, after noting exceptions based on a plaintiff's reliance on written labels or advertisements, an employer-employee relationship, and in "special cases" involving food, pesticides, and pharmaceuticals, the court went on to note that the plaintiff did not seek applications of any of the established exceptions. *Id.* at 1023. Rather, the plaintiff in *Clemens* invited the creation of a "similar exception" for his case, an invitation which the court declined, noting that "a federal court sitting in diversity is not free to create new exceptions to it." *Id.* at 1024. Thus, the Ninth Circuit had no occasion in *Clemens* to consider the California appellate cases recognizing the third-party beneficiary exception to the vertical privity requirement of implied warranty claims and, for this reason, *Clemens* is not at odds with the Court's decision, which merely applies an established exception articulated by California appellate courts.

b. *Exception: Dangerous Instrumentality*

■ Plaintiffs also advocate for an exception to the privity requirement for the sale of "dangerous instrumentalities." Fifty years ago, the California Supreme Court rejected the suggestion that it adopt a blanket rule that a plaintiff exposed to dangerous instrumentalities with latent defects need not be in privity with the manufacturer to sue for breach of warranty. *Peterson v. Lamb Rubber Co.,* 54 Cal.2d 339, 346–47, 5 Cal.Rptr. 863, 353 P.2d 575 (1960) ("Thus, none of these five cases provides clear support for the general proposition for which they were cited: that privity is not required where the item sold was inherently dangerous."). The court did so in favor of a rule that permitted employees to be considered "a member of the industrial 'family' of the employer," who was in privity with the manufacturer.

*Id.* The current Plaintiffs do not fall within such a subset.

Plaintiffs' reliance on *Alvarez v. Felker Mfg. Co.*, 230 Cal.App.2d 987, 41 Cal.Rptr. 514 (1964), does not compel a contrary result. Although Plaintiffs cite dicta from *Alvarez* that tends to support their position, the *Alvarez* court later clarifies that a manufacturer's strict liability for latent defects in dangerous instrumentalities is a creature of tort law, not breach of warranty. *Id.* at 1005, 41 Cal.Rptr. 514 ("The nature of the strict liability of a manufacturer resulting from the sale of defective products was finally put to rest by *Greenman[,]* which declared that such liability is not one governed by the law of contract warranties or the implied warranties of the sales act, but by the law of strict liability in tort, and that the rules defining and governing warranties cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed.") (internal quotation marks and citations omitted).

Thus, Plaintiffs' lack of vertical privity is not excused by the dangerous instrumentality exception.

### 2. *Manifestation of Defect*

Defendants contend that those Plaintiffs whose vehicles have not manifested the alleged defect because they have not been involved in an SUA event may not maintain a breach of implied warranty claim. Defendants rely on *American Suzuki Motor Corp. v. Superior Court of L.A. County*, 37 Cal.App.4th 1291, 1296–98, 44 Cal. Rptr.2d 526 (1995), which held that a class of vehicle owners prone to roll-over accidents should be decertified because the relevant evidence established that only a small percentage of the vehicles had been involved in accidents. In the absence of a defect that manifested itself more frequently, the California Court of Appeal

held that there was no ascertainable class. *Id.* at 1299, 44 Cal.Rptr.2d 526. A subsequent California Supreme Court case has suggested that *American Suzuki* represented an impermissible inquiry into the merits of claims in resolving a motion for class certification. *See Linder v. Thrifty Oil Co.*, 23 Cal.4th 429, 443, 97 Cal.Rptr.2d 179, 2 P.3d 27 (2000); *cf. Conley v. Pacific Gas and Elec. Co.*, 131 Cal.App.4th 260, 268, 31 Cal.Rptr.3d 719 (2005) ("We agree that the holding in *American Suzuki* on which the trial court relied has been placed in serious question, if not overruled, by *Linder*'s holding that class certification generally should not be conditioned upon a showing that class claims for relief are likely to prevail.") (internal quotation marks and citation omitted).

In the present context, the Court finds *American Suzuki* of little persuasive value. This case is at the pleadings stage, and evidence on the relative occurrence of events of SUA is undefined. Thus, Defendants' authority does not support dismissal of Plaintiffs' breach of implied warranty claims at the pleadings stage.

### VII. *Breach of Contract/Common Law Warranty Claims (Eighth Cause of Action)*

Defendants move to dismiss Plaintiffs' eighth cause of action based on common law causes of action as duplicative of their statutory claims. Plaintiffs oppose, explaining these claims are pled in the alternative, which is permitted pursuant to Fed.R.Civ.P. 8(d)(2) and 8(a)(3). Dismissal of these common law alternatives at the pleadings stage is not warranted.

### VIII. *Revocation of Acceptance (Sixth Cause of Action)*

Plaintiffs bring a claim pursuant to Cal. Com.Code § 2608 for revocation. Defendants contend that Plaintiffs may not

revoke acceptance against a non-seller manufacturer. The Court agrees.

Section 2608 of the California Commercial Code provides for revocation of acceptance of defective goods:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
>
> (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
>
> (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Cal. Com.Code § 2608.

Under § 2608, a seller who accepts goods without discovery of a defect based on the difficulty of discovery of that defect or by the seller's assurances, may thereafter revoke his or her acceptance so long as revocation occurs "within a reasonable time" after discovery. *Id.* Revocation becomes effective when the buyer notifies the "seller" of revocation. A "seller" is defined as "a person who sells or contracts to sell goods." Cal. Com.Code § 2103(1)(d). A "sale" is "the passing of title from the seller to the buyer for a price." Cal. Com.Code § 2106(3).

Here, with the exception of the Plaintiffs discussed in note 23, *supra*, who allege they purchased vehicles directly from De-fendants, Plaintiffs have not alleged that they purchased their vehicles from Defendants. Thus, they seek revocation against an improper Defendant.

Plaintiffs acknowledge Defendants' role in their purchase transactions; however, they cite a number of cases in which UCC revocation against non-sellers was permitted. These non-California cases do not convince the Court.

Plaintiffs rely on *Ford Motor Credit Co. v. Harper*, 671 F.2d 1117, 1126 (8th Cir. 1982), in which the court applied Arkansas's version of U.C.C. § 2–608, rejecting an argument that a purchaser could not revoke as to a non-seller manufacturer; however, in doing so, it noted that failure to allow such revocation would leave the purchaser without a remedy because the intermediary was no longer in business. *Id.* Such a result, the court noted, would be inconsistent with the UCC's remedial purpose. *Id.* The present allegations do not suggest that this situation is of concern in the present case. Additionally, in reaching its conclusion, the court in *Harper* relied on the elimination, by Arkansas statutory law, of the privity requirement as to UCC warranties; in contrast, California has not eliminated the privity requirement. *Id.*

Plaintiffs also rely on *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 357–58 (Minn.1977), which applied Minnesota's version of U.C.C. § 2–608, permitting revocation of a purchase agreement. *Id.* However, the court did so based on the UCC provision that allows a purchaser to elude the limitation of a warranty where it fails of its essential purpose. *See e.g.*, Cal. Com.Code § 2719 (U.C.C. § 2–719). Plaintiffs here do not argue, other than briefly quoting *Durfee* on this point, that the relevant express written warranty fails of its essential purpose within the meaning of Cal. Com.Code § 2719. In the absence

of briefing on the issue whether the relevant warranties have failed of their essential purpose, the Court does not address it.[24]

The rationale of *Volkswagen of America, Inc. v. Novak*, 418 So.2d 801, 804 (Miss. 1982), is similar. This case also noted that permitting revocation as to a non-seller manufacturer was appropriate where "the retailer[']s sales contract [was] accompanied by the manufacturer's warranty, [such that they] are so closely linked both in time of delivery and subject matter, that they blend[ ] into a single unit at the time of sale." *Id.* The *Volkswagen* court cites no authority for this extension of the UCC beyond its clear language, and there is no indication that California would adopt such a strained construction.

Similarly, another case upon which Plaintiffs rely, *Gochey v. Bombardier, Inc.*, 153 Vt. 607, 613, 572 A.2d 921, 924 (Vt. 1990), blurs the distinction between the manufacturer's warranty and the purchase contract with a retailer in a manner not supported by California law. *Id.* at 613, 572 A.2d 921 ("When the manufacturer's defect results in revocation by the consumer, the manufacturer must assume the liability it incurred when it warranted the product to the ultimate user.").

Thus, the Court concludes Plaintiffs have not stated a claim for revocation.

IX. *Magnuson–Moss Warranty Act (Seventh Cause of Action)*

A. *Relation to State Warranty Claims*

Defendants and Plaintiffs agree that Plaintiffs' claims pursuant to the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act ("MMA"), 15 U.S.C. §§ 2301–2312, *et seq.*, is dependent upon their state-law warranty claims. *See*

*Daugherty*, 144 Cal.App.4th at 833, 51 Cal. Rptr.3d 118 (noting that MMA "authorizes a civil suit by a consumer to enforce the terms of an implied or express warranty [and] 'calls for the application of state written and implied warranty law, not the creation of additional federal law' ") (internal quotation marks and citation omitted). Thus, to the extent Plaintiffs have stated express and implied warranty claims, they have also stated claims under the MMA.

B. *Requirement that Consumers Follow Dispute Resolution Process*

■ Defendants argue that the MMA claims must be dismissed to the extent they are asserted by Plaintiffs who failed to avail themselves of Toyota's informal dispute resolution procedures as required by 15 U.S.C. § 2310(a). Toyota's Warranty Manuals detail its "Dispute Settlement Program." (*See, e.g.,* Gilford Decl. Ex. B at 22 (noting that consumers "must use the Dispute Settlement Program before seeking remedies through a court action pursuant to the Magnuson–Moss Warranty Act.").)

The MMA contains an explicit congressional policy statement encouraging "warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms." 15 U.S.C. § 2310(a)(1). Pursuant to this policy, a "class of consumers may not proceed in a class action . . . unless the named plaintiffs . . . initially resort to [the warrantor's informal dispute settlement mechanism]." *Id.* § 2310(a)(3)(C)(ii).

Plaintiffs contend that compliance with the informal dispute settlement procedure is excused because, in light of Defendants' response to incidents of SUA events, it

---

**24.** It is for this reason that the Court's dismissal of the revocation claim is without prejudice.

would be futile. (*See* Pltfs.' Opp'n Brief at 48.) One district court in the Ninth Circuit has recognized a futility exception to the pre-suit requirement of utilizing an informal dispute mechanism. *See Milicevic v. Mercedes–Benz USA, LLC*, 256 F.Supp.2d 1168, 1179 (D.Nev.2003), *aff'd on other grounds*, 402 F.3d 912 (9th Cir. 2005). Another district court in the Ninth Circuit, although denying a motion to certify a class of plaintiffs asserting MMA claims based on the representatives' failure to avail themselves of a dispute settlement mechanism, nevertheless left open the possibility that, under the right circumstances, compliance with such a mechanism might be excused. *See Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 593 (C.D.Cal.2008) ("Plaintiffs do not allege any attempt to use the BBB Auto Line to resolve their MMA claims because, as they assert, such attempts are 'unnecessary and/or futile.' ... Without further elaboration by plaintiffs regarding the alleged futility ..., the Court concludes that plaintiffs' MMA claims are not certifiable.") (internal citations omitted).

In the absence of additional federal case law to the contrary, which the parties have not cited and the Court's research has not revealed, the Court is inclined to follow the lead of the other district courts in this circuit. At the pleadings stage, the Court cannot say whether attempts to comply with the informal dispute settlement procedure put in place by Toyota are futile. Plaintiffs' allegations allow for such an inference. (*See e.g.*, ¶¶ 236–243 (description of Defendants' response to claims of SUA events).)

## X. *Fraud by Concealment (Ninth Cause of Action)*

### A. *Heightened Pleading Requirement and Elements*

■ As previously noted, to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), allegations of fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See supra* section V.A. As applied to Plaintiffs' claim for fraud by concealment, a fraud by omission or fraud by concealment claim "can succeed without the same level of specificity required by a normal fraud claim." *Baggett*, 582 F.Supp.2d at 1267. This is because "[r]equiring a plaintiff to identify (or suffer dismissal) the precise time, place, and content of an event that (by definition) did not occur would effectively gut state laws prohibiting fraud-by-omission." *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*, 684 F.Supp.2d 942, 961 (N.D.Ohio 2009). Similarly, Rule 9(b)'s requirement may also be relaxed as to matters within the opposing party's knowledge; for example, in cases of corporate fraud where plaintiffs lack personal knowledge of all underlying facts. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir.1989). In such matters, allegations may be made on information and belief so long as they are accompanied by a statement of facts on which the belief is founded. *Id.*

■ To state a claim for fraudulent concealment under California law, a plaintiff must allege: " '(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage.' " *Baggett v. Hewlett–Packard Co.*, 582 F.Supp.2d 1261, 1267 (C.D.Cal.2007) (quoting *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 990, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004)). If the alleged fraud is based upon a concealment, it is actionable only if the defendant had a duty to disclose the concealed fact. *Id.* at 1267. A plaintiff may demonstrate a duty to disclose in four circumstances: "(1) when the defendant is

in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact." *Id.* at 1267–68 (citing *LiMandri*, 52 Cal.App.4th at 336, 60 Cal.Rptr.2d 539). Information is material when, "had the omitted information been disclosed, the reasonable consumer would have been aware of it and behaved differently." *Id.* at 1268 (internal quotation marks omitted).

### B. *Pleading–with–Particularity Requirement of Fed.R.Civ.P. 9(b)*

The crux of Toyota's argument that Plaintiffs' claims are deficiently pled is that Plaintiffs fail to identify a common defect or malfunction in the ETCS that was supposedly concealed from consumers. (Defs.' Mem. at 20–21.) Toyota argues that listing potential defects that cause SUA is insufficient to meet the particularity requirements of Rule 9(b), and that Plaintiffs do not present any alleged representations or omissions to back up their fraud by concealment claim. (*Id.* at 22.) Toyota's supposed failures to disclose amount to nothing more than conclusory statements based on Plaintiffs' unsupported theory that the ETCS contains a mysterious defect. (*Id.* at 28.)

In response, Plaintiffs allege that the common defect is SUA, which has resulted in thousands of crashes and at least 78 deaths, which may have been prevented but for a second defect, the lack of a fail safe, such as a brake-override system. (Pltfs.' Opp'n Brief at 1.) The series of defects that can cause SUA, combined with the statistically significant increase in SUA events in cars with ETCS, present serious safety risks that were not disclosed to consumers. (*Id.* at 23.)

The Court finds that Plaintiffs plead fraudulent concealment with the requisite particularity under Rule 9(b). Plaintiffs' allegations include specific facts showing Toyota's knowledge and concealment of the alleged defect, including: concealment of technical service bulletins (¶ 116), withholding knowledge of tens of thousands of consumer complaints potentially related to SUA (¶ 149), failure to report replication of non-driver-error SUA event to NHTSA (¶ 151), documenting SUA in "Field Technical Reports" and a "Dealership Report" that were not disclosed to consumers (¶ 152–54), claiming lack of diagnostic code to cover up alleged SUA defect (¶ 165), concealment of 60,000 "surging" complaints (¶ 170), internally recognizing but not disclosing "[f]laws in Toyota Regulatory and Defect Process" (¶ 175), withholding "Technical Information" bulletin and sticky accelerator information from U.S. distributors and consumers (¶¶ 203–04), misstating that "no defect exists" and erroneously stating that NHTSA confirmed as much (¶¶ 205–06), concealing the fact that "WE HAVE A tendency for MECHANICAL failure in accelerator pedals ... The time to hide on this one is over. We need to come clean ...." (¶ 213, emphasis cited in MCC from underlying source), allegedly ignoring documents "contain[ing] preliminary fault analysis" (¶ 222), and instructing quality control employees to cover up defects (¶ 235), among others.

These allegations sufficiently plead the "what" (concealment of an SUA defect (¶ 398)), the "why" (to induce customers to purchase Toyota cars at the prices sold (¶ 401)), and the "how" (instead of telling consumers about SUA problems, the problems were concealed so that Toyota's business would not be disrupted by NHTSA investigations and/or recalls and of negative publicity (¶¶ 158–60, 169, 171)). *See, e.g., Baggett*, 582 F.Supp.2d at 1267, *Marsikian v. Mercedes Benz USA, LLC*, Case

No. CV 08–04876 AHM (JTLx), 2009 U.S. Dist. LEXIS 117012, at *20–21 (C.D.Cal. 2009); *Carideo v. Dell, Inc.*, 706 F.Supp.2d 1122, 1133 (W.D.Wash.2010).

Unlike the unsupported defect alleged in *Alienware*, cited by Toyota, Plaintiffs here include facts in support of their allegations. *See Oestreicher*, 544 F.Supp.2d at 974. While the Court is mindful that allegations of fraud, without more, cannot be the basis for an alleged design defect claim, *id.*, Plaintiffs' fraudulent concealment claim pleads particular facts in support of the defect allegations, and that is all that is required at this stage.

### C. *Fraudulent Concealment*
#### 1. *Duty to Disclose*

■ The Court finds that Plaintiffs have sufficiently alleged a fraudulent concealment claim under California law. First, because Plaintiffs allege concealment, they must demonstrate that Toyota had a duty to disclose the concealed information. Plaintiffs do not allege that Toyota owed them a duty to disclose as a result of a fiduciary relationship. Rather, they argue that (a) Toyota had exclusive knowledge of material facts not known to Plaintiffs, (b) Toyota actively concealed material facts from Plaintiffs, and (c) Toyota made partial representations while suppressing some material facts. (Pltfs.' Opp'n Brief at 26.)

Toyota argues that Plaintiffs cannot establish that Toyota owed them a duty to disclose. (Defs.' Mem. at 28–29.) It contends that Plaintiffs do not allege facts to show that Toyota had exclusive knowledge of the alleged ETCS defect, or that it actively concealed such information to induce Plaintiffs to purchase its vehicles. (*Id.* at 29.)

Taking each duty to disclose factor in turn, the Court finds that Plaintiffs have sufficiently alleged a duty to disclose.[25]

#### a. *Exclusive Knowledge of Material Facts*

■ Whether non-disclosed information is material depends on the effect the information would have on a reasonable consumer. *Falk*, 496 F.Supp.2d at 1095. Plaintiffs allege that had the SUA defect been disclosed, they would have acted differently. (¶ 403.) Alone, this allegation may be insufficient to establish materiality. *See Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1145 (N.D.Cal.2005) (similar anecdotal evidence on its own insufficient to raise genuine issue on summary judgment). Plaintiffs also argue that reasonable people would find the concealed information regarding the SUA defect material. (¶¶ 398, 400.)

Given the fact that an average consumer would not expect an SUA defect, combined with the high costs and risks associated with potential serious accidents, Plaintiffs' allegations are sufficient to demonstrate materiality. The Court agrees with the reasoning in *Falk* that "[c]ommon experience supports Plaintiffs' claim that a potential car buyer would view as material a defect[ ]" that relates to control over the speed of the car. *Id.* at 1096 (discussing speedometer readout defect). Because the alleged SUA defect affects whether a potential car buyer can safely maintain control over the speed of the car, the alleged defect is material.

Plaintiffs further allege that Toyota had exclusive knowledge pertaining to the SUA

---

**25.** Plaintiffs also allege that the potential for SUA constitutes a safety hazard. The risk of injury and/or death associated with the alleged SUA defect is the type of "unreasonable risk" that leads to a duty to disclose under California law. *Daugherty*, 144 Cal.App.4th at 836, 51 Cal.Rptr.3d 118. *See also Falk*, 496 F.Supp.2d at 1096 (citing as further strength of plaintiffs' defect allegations "the [alleged] risk of inadvertent speeding, driving at unsafe speeds, and accidents").

defect. Specifically, Toyota had superior and/or exclusive knowledge of: NHTSA's findings of a 400% increase in "Vehicle Speed" complaints in Camry's with ETCS (¶ 122), 37,000 concealed consumer complaints (¶¶ 124, 149), secret Field Technical Reports and Dealership Report (¶¶ 129, 152–54, 210), issues with the electronic throttle actuator assemblies shared only with dealers and later NHTSA (¶ 145), eliminated reference to ETCS/speed control problems (¶¶ 158–59), concealed "surging" complaints (¶ 170), and the increasing number of consumer complaints post-recall, demonstrating the problem has not been fixed (¶ 219).

Taking Plaintiffs' allegations as true, they support a claim of Toyota's exclusive knowledge. *See Falk*, 496 F.Supp.2d at 1096 (sufficient allegations of exclusive knowledge where car manufacturer had exclusive access to aggregate dealership data, pre-release testing data, and numerous consumer complaints). The record of complaints made by Toyota customers show that Toyota was clearly aware of the alleged SUA problem.[26] While Toyota shared some information regarding SUA with NHTSA and eventually with consumers, Toyota remained in a superior position of knowledge. While prospective customers could have been tipped off to the possibility of SUA by researching past complaints filed with NHTSA, many customers would not have performed such a search, nor would they be expected to. Thus, Plaintiffs have sufficiently alleged that Toyota knew significantly more about the alleged SUA defect than the limited information that was eventually shared with the public.

#### b. *Active Concealment*

Plaintiffs sufficiently allege active concealment. Specifically, Plaintiffs allege that starting in 2002, Toyota was on notice of an SUA defect, but hid this defect from regulators and consumers. (¶ 398; *see also* ¶¶ 131, 134, 149, 151, 160, 170, 186 (withholding information from NHTSA); ¶ 137 (allegedly misstating that no evidence of propensity for SUA was found in ETCS vehicles).) Toyota actively concealed a substantial portion of consumer complaints regarding SUA and excluded relevant categories of incidents when investigations were underway. (¶ 398; *see also* ¶¶ 149, 170 (withholding consumer complaints).) Further, Toyota actively concealed the real reason for the recall and concealed the fact that floor mats were not the only culprit. (¶ 398; *see also* ¶ 228 (70% of SUA events are not accounted for in the floor mat and sticky pedal recalls).)

Plaintiffs' allegations that Toyota repeatedly denied the existence of the alleged SUA defect (e.g., ¶¶ 236–41) are sufficient to demonstrate active concealment. *See Tietsworth*, 720 F.Supp.2d at 1135–36 (active concealment sufficiently alleged where plaintiffs contacted defendant for service of defective machines and were told there was no defect and/or denied free service or replacement parts).

While Toyota's recall in and of itself does not support a permissible inference that Toyota actively concealed the alleged SUA defect, *see Tietsworth*, 2009 WL 3320486, at *5, the additional allegations that recall repairs were offered alongside Toyota covering up the true defect may lead to such an inference. (*See, e.g.,* ¶¶ 201, 228, 235, 398 (covering up defect and/or other causes).)

---

**26.** Although Toyota discounts Plaintiffs' allegations of an SUA defect, "[t]he amassed weight of these complaints suggests that plaintiffs' [unexplained SUA events] were not isolated cases. Instead, when viewed in the light most favorably to the plaintiffs, these collected complaints [may] suggest strongly that there was a defect ...." *Falk*, 496 F.Supp.2d at 1096.

### c. *Partial Representations*

In support of their partial representations argument, Plaintiffs point to "the exact language Toyota used to describe vehicle safety to customers." (Pltfs.' Opp'n Brief at 26.) Plaintiffs contend that the representations made therein are false because the vehicles have a propensity to accelerate suddenly and lack an adequate fail-safe mechanism. (*Id.* at 23.) Toyota argues that its alleged partial disclosures in the form of generalized assertions made to the public regarding safety do not give rise to a duty to disclose. (Defs.' Mem. at 30.)

However, an examination of the statements Plaintiffs allege were made reveal that at least some of them may be misleading (*see, e.g.,* ¶¶ 102–03 (discussing safety systems while not disclosing alleged SUA defect and lack of fail-safe mechanism; implying the recalls will "make[ ] things right")), and others can be proved or disproved during discovery (*see, e.g.,* ¶ 242 ("there have been no confirmed or documented reports or findings of any type of computer malfunctions related to the brake/acceleration or electrical systems"); ¶ 244 ("the brakes will always override the throttle"); ¶ 245(4)(a) (Toyota has told the public it conducted extensive electronic defect testing when it allegedly did not).) The latter statements are enough to allege partial misrepresentations. *See, e.g., Annunziato,* 402 F.Supp.2d at 1139 ("While some of eMachines' representations consti-

tute puffery, others do not. . . . [A]t least some actionable statements have been pled."); *Stickrath v. Globalstar, Inc.,* 527 F.Supp.2d 992, 998–99 (N.D.Cal.2007) (same).

### 2. *Remaining Fraud Elements*

The Court finds Plaintiffs sufficiently allege the remaining elements of a fraudulent concealment claim under California law. Plaintiffs plead that Toyota knew or should have known of the alleged SUA defect, as demonstrated in the many citations to the MCC above regarding Toyota's knowledge. Plaintiffs also plead that Toyota intended to defraud them in order to induce reliance on the part of consumers so they would buy Toyota vehicles. (¶ 401.) Plaintiffs allege justifiable reliance that the vehicles would be free from an SUA defect (¶¶ 398, 400, 403), and resulting damage (¶ 260), including under Cal. Civ.Code § 3343 or Cal. Civ.Code § 1692. (¶ 404.) *See Falk,* 496 F.Supp.2d at 1099.

Thus, Toyota's motion to dismiss Plaintiffs' fraudulent concealment claim is denied.

### XI. *Unjust Enrichment (Tenth Cause of Action)*

Plaintiffs have asserted a claim for unjust enrichment. (¶¶ 406–10.) The Court agrees with Toyota that unjust enrichment is not an independent cause of action under California law. Plaintiffs have cited several cases where claims for unjust enrichment have proceeded past the pleading stage.[27] (Opp'n Brief at 50–51.) Nonethe-

---

**27.** For example, Plaintiffs cite *Snowney v. Harrah's Entm't, Inc.,* 35 Cal.4th 1054, 29 Cal.Rptr.3d 33, 112 P.3d 28 (2005), in support of their assertion that "the California Supreme Court has permitted concurrent contract and unjust enrichment claims." (Pltfs.' Opp'n Brief at 51.) In *Snowney,* however, the California Supreme Court addressed whether the defendants were subject to personal jurisdiction, not whether unjust enrichment was a cognizable claim. *See id.* at

1061–70, 29 Cal.Rptr.3d 33, 112 P.3d 28. Although the Supreme Court did not dismiss the plaintiffs' claim for unjust enrichment, the issue presented to the court was purely jurisdictional: the viability of the plaintiffs' unjust enrichment claim was not at issue. Thus, neither this case nor any other case cited by Plaintiffs persuades the Court to adopt the minority view that unjust enrichment is an independent claim under California law.

less, the Court is not persuaded that an independent cause of action for unjust enrichment is cognizable under California law.

 Courts consistently have held that unjust enrichment is not a proper cause of action under California law. "The phrase 'unjust enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." *Melchior v. New Line Prod., Inc.*, 106 Cal.App.4th 779, 793, 131 Cal.Rptr.2d 347 (2003) (quoting *Lauriedale Assoc., Ltd. v. Wilson*, 7 Cal.App.4th 1439, 1448, 9 Cal. Rptr.2d 774 (1992)). "Unjust enrichment is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself." *Id.* (quoting *Dinosaur Dev., Inc. v. White*, 216 Cal.App.3d 1310, 1315, 265 Cal.Rptr. 525 (1989) (quotation marks omitted)). Simply put, "there is no cause of action in California for unjust enrichment." *Id.* Therefore, Plaintiffs' claim for unjust enrichment fails to state a claim for which relief may be granted.[28]

Accordingly, the Court dismisses Plaintiffs' claim for unjust enrichment.

## XII. *Availability of Injunctive Relief*

Toyota contends that Plaintiffs may not be awarded the injunctive relief they seek because the requested injunction would amount to a nationwide recall that is preempted by a federal statute, and because the relief sought is within the primary jurisdiction of an administrative agency. The Court rejects both theories.

### A. *Preemption*

Plaintiffs have requested an "injunction ordering Toyota to implement an effective fail-safe mechanism on all vehicles with

ETCS." (MCC at 153 (prayer for relief ¶ i).) Toyota argues that the requested injunction amounts to a court-ordered recall and, therefore, must be stricken because a nation-wide recall is preempted by the National Traffic Safety Act of 1966 (the "Safety Act"), 49 U.S.C. §§ 30101 *et seq.* (Defs.' Mem. at 51.) Several courts have decided whether claims requesting injunctive relief are preempted by the Safety Act; in doing so, these courts have reached contrary results. *Compare, e.g., In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 153 F.Supp.2d 935, 948 (S.D.Ind.2001) (hereinafter, *"Bridgestone"*) (dismissing claim requesting relief in the form of a judicial recall as preempted by the Safety Act), *and Cox House Moving, Inc. v. Ford Motor Co.*, Case No. 7:06–1218–HMH, 2006 WL 2303182, at *9 (D.S.C. Aug. 8, 2006) (same), *with Chamberlan*, 314 F.Supp.2d at 967 (denying motion to dismiss a claim seeking injunctive relief under the UCL on the grounds that the claim was not preempted by the Safety Act), *and Marsikian*, 2009 U.S. Dist. LEXIS 117012, at *21 (same). The Court finds the reasoning of *Chamberlan* and *Marsikian* more compelling than that of *Bridgestone* and *Cox House Moving.*

As a preliminary matter, the Court notes that Toyota's briefs do not clearly state the grounds for Toyota's motion on this issue. Toyota asserts that Plaintiffs' request for an injunction "must be stricken," (Defs.' Mem. at 51), and that the authorities it cites "requir[e] dismissal of automobile recall claims." (Reply at 20.) The Court, therefore, is unclear as to whether Toyota is moving to strike the requested relief pursuant to Rule 12(f) or to dismiss a claim or claims underlying the

---

**28.** Additionally, the Court notes that the Plaintiffs have alleged a claim for restitution. Thus, a claim for unjust enrichment "would not enlarge the range of remedies Plaintiffs

may otherwise seek." *Marsikian*, 2009 U.S. Dist. LEXIS 117012, at *21 (citing *Baggett*, 582 F.Supp.2d at 1270–71 and *Falk*, 496 F.Supp.2d at 1099).

requested relief pursuant to Rule 12(b)(6). If Toyota is moving to dismiss claims underlying Plaintiffs' requested relief pursuant to Rule 12(b)(6), Toyota has failed to state which of Plaintiffs' claims it seeks to dismiss on the grounds of preemption. In fact, other than a vague reference to "automobile recall claims," Toyota has not identified specific claims asserted by Plaintiffs that are preempted by the Safety Act. This omission, in conjunction with Toyota's statement that the requested relief "must be stricken," implies that Toyota is moving to strike Plaintiffs' request for injunctive relief under Rule 12(f). However, Rule 12(f) does not provide proper grounds to strike Plaintiffs' request for injunctive relief. In resolving the issue of first impression earlier this year, the Ninth Circuit held "that Rule 12(f) of the Federal Rules of Civil Procedure does not authorize a district court to strike a claim for damages on the ground that such damages are precluded as a matter of law." *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 971 (9th Cir.2010). The Ninth Circuit's reasoning in *Whittlestone* applies with equal force to claims for injunctive relief. *See East v. City of Richmond*, Case No. C 10–2392 SBA, 2010 WL 4580112, at *6 n. 3 (N.D.Cal. Nov. 3, 2010). Nonetheless, the Court will proceed with the preemption analysis because, even if Toyota argues that certain claims should be dismissed under Rule 12(b)(6) on preemption grounds, the Court finds that Toyota has failed to show that Plaintiffs' request for injunctive relief or any claims underlying Plaintiffs' requested relief are preempted by the Safety Act.

Federal preemption of State law may be express or implied. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). The Safety Act does not include "explicit preemptive language." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). In fact, the Safety Act expressly provides that rights and remedies created by the Act are supplemental to rights and remedies provided by State law. *See* 49 U.S.C. § 30103(d). Thus, the Safety Act does not expressly preempt State law.

Where the Court determines that Congress has not expressly preempted State law, the Court will consider whether Congress has impliedly preempted State law. There are two types of implied preemption: field preemption and conflict preemption. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Toyota does not argue that field preemption applies.[29] Rather, Toyota argues that conflict preemption is present. (*See* Mot. Brief at 53, Reply Brief at 19.)

Conflict preemption exists "where state law conflicts with federal law, either [ (1) ] because it [i]s impossible to comply with both laws or [ (2) ] because state law stands as an obstacle to accomplishing the purposes of federal law." *Nat'l Meat Ass'n v. Brown*, 599

---

29. In any event, the Court finds that field preemption is not present. "The plain language of 49 U.S.C. § 30103(b)(1) indicates ... that Congress intended to leave open to consumers State remedies in addition to the administrative petition process. Even if the relevant field were recalls, because this savings clause also makes particular reference to notification and recall provisions as non-exclusive remedies, [an] argument that State law in this area is field-preempted [would] run[ ] contrary to the plain language of the statute." *Chamberlan*, 314 F.Supp.2d at 959–60. In addition to the plain language of the Safety Act, case law and legislative history "support the conclusion that Congress did not intend to supplant all State regulation of motor vehicle safety." *Id.* at 961. Thus, Plaintiffs' request for injunctive relief is not field-preempted by the Safety Act.

F.3d 1093, 1097 (9th Cir.2010). The former is commonly referred to as impossibility, while the latter is commonly referred to as frustration-of-purpose. *See Geier v. American Honda Motor Co.,* 529 U.S. 861, 874, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Toyota argues that Plaintiffs' request for an injunction is preempted on frustration-of-purpose grounds, as a "nationwide, court-ordered recall [which] would directly conflict with and frustrate the Safety Act." (Defs.' Mem. at 53) (quoting *Lilly v. Ford Motor Co.,* Case No. 00 C 7372, 2002 WL 84603, at *5 (N.D.Ill. Jan. 22, 2002) (internal quotation marks omitted).) For the Court to find that Plaintiffs' requested relief is conflict-preempted, "[t]here must be 'clear evidence' of such a conflict." *Chamberlan,* 314 F.Supp.2d at 957 (quoting *Geier,* 529 U.S. at 885, 120 S.Ct. 1913). "Speculative or hypothetical conflict is not sufficient: only State law that 'actually conflicts' with federal law is preempted." *Id.* (quoting *Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)).

■■■■ As a threshold matter, the Court must decide if the presumption against preemption applies to this case. "There is a presumption against implied preemption of State law in areas traditionally regulated by the States." *Id.* at 958 (citing *California v. ARC Am. Corp.,* 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989)). This presumption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke,* 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). Therefore, "determining whether the presumption against preemption applies here turns on whether this area of law is a field which the States have traditionally occupied or, conversely, an area where there has been significant federal presence." *Bridgestone,* 153 F.Supp.2d at 941.

The conflicting outcomes of *Bridgestone* and *Chamberlan* are attributable, in large part, to the contrary conclusions those courts drew on this issue. The courts reached contrary conclusions because they defined the area of law relevant to the inquiry differently. In *Bridgestone,* the court concluded that the presumption against preemption did not apply to a claim for injunctive relief in the form of a recall because "states have never assumed a significant role in *recalls* related to vehicle safety." *Id.* at 942 (emphasis in original). In *Chamberlan,* on the other hand, the court concluded that the relevant area of law was not that of recalls, but rather of motor vehicle safety. 314 F.Supp.2d at 958. Thus, the *Chamberlan* court found that the presumption against preemption was triggered because motor vehicle safety "is an area of traditional State police power." *Id.* (citing *City of Columbus v. Ours Garage & Wrecker Serv.,* 536 U.S. 424, 439, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002)).

This Court agrees with the *Chamberlan* court that the proper area of law to consider in determining whether Plaintiffs' requested relief falls within an area of law traditionally occupied by the States or one where there has been a significant federal presence is that of motor vehicle safety. A recall "is a remedy rather than a substantive field of regulation." *Id.* Therefore, recalls do not provide the relevant area of law. Rather, the regulatory field in question is more properly defined as that of motor vehicle safety. *See Marsikian,* 2009 U.S. Dist. LEXIS 117012, at *22. Motor vehicle safety is an area of law traditionally regulated by the states. Even the *Bridgestone* court noted that "[f]or certain, vehicle safety is not an area in which 'Congress has legislated ... from the earliest days of the Republic.'" 153 F.Supp.2d at 943 (quoting *Locke,* 529 U.S. at 108, 120

S.Ct. 1135). "In fact, '[i]n no field has ... deference to state regulation been greater than that of highway safety regulation.'" *Chamberlan,* 314 F.Supp.2d at 958 (quoting *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 443, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978)). Thus, because the Court concludes that motor vehicle safety, not recalls, is the area of law applicable to the presumption inquiry, the Court finds that the presumption against preemption applies in this case.

■ In light of the presumption against preemption, the Court must determine whether an actual conflict exists between the relief sought by Plaintiffs and the Safety Act.[30] "[B]ecause a presumption against preemption applies in this case, Defendant bears the burden of showing that it was Congress' 'clear and manifest' intent to preempt State law." *Id.* at 962 (quoting *ARC Am. Corp.,* 490 U.S. at 101, 109 S.Ct. 1661).[31] Toyota has not met its burden of showing that it was Congress' clear and manifest intent for the Safety Act to preempt the relief Plaintiffs seek pursuant to their State law claims.

"As a preliminary matter, in determining whether there is an actual conflict, it is not appropriate to 'split remedies.'" *Kent v. DaimlerChrysler Corp.,* 200 F.Supp.2d 1208, 1217 (N.D.Cal.2002). In arguing that an actual conflict exists between the recall sought by Plaintiffs and the Safety Act, Toyota has failed to explain why the Court should treat Plaintiffs' request for a recall differently from its request for other forms of relief for the purpose of its conflict preemption analysis. The *Kent* Court explained that:

> ordinarily it is assumed that the full cause of action under state law is either available or preempted. [*Int'l Paper v. Ouellette,*] 479 U.S. [481,] 499 n. 19, 107 S.Ct. 805, 93 L.Ed.2d 883 [(1987)]. Remedies are split only when there is evidence of Congressional intent to treat remedies differently. The Court finds no indication in the language of the Safety Act that Congress intended that actions for injunctive relief should be treated differently from actions for damages. Indeed, if an injunction requiring a particular repair would 'interfere' with the federal regulatory scheme—so too would a damages award based on the failure to make such a repair. Therefore, the Court declines to treat Plaintiffs' request for injunctive relief differently from its request for damages in determining whether or not there is an actual conflict.

200 F.Supp.2d at 1217.[32] Likewise, in this case, Toyota has not explained why the

---

**30.** As explained in the next paragraph, the Court notes that the proper inquiry is not whether a conflict exists between the relief sought and the Safety Act. Rather, the proper inquiry is whether a conflict exists between a State law or a claim asserted thereunder and the Safety Act. Nonetheless, because Toyota's motion on this issue focuses on the request for injunctive relief contained in paragraph (i) of the Prayer for Relief of the MCC and because that request is grounded in other claims asserted in the MCC, the Court's analysis likewise addresses why the request for relief does not actually conflict with the Safety Act.

**31.** "Were there no presumption against preemption in this case, Defendant would still

need to demonstrate 'clear evidence of conflict' to support its theory that State law is preempted." *Id.* (quoting *Geier,* 529 U.S. at 885, 120 S.Ct. 1913.) Even under such a standard, Toyota's failure to demonstrate an actual conflict between Plaintiffs' requested relief and the Safety Act would be fatal to its preemption argument.

**32.** In *Kent,* the Plaintiffs had requested "that the Court create a fund available to remedy the park-to-reverse defect and to order Defendant to bear the cost of notice to Class Members." *Id.* at 1217, n. 3 (internal quotations omitted). Plaintiffs in that case did not seek a court-ordered recall. However, this distinction between *Kent* and the instant case does

Court should treat Plaintiffs' request for "an injunction ordering Toyota to implement an effective fail-safe mechanism on all vehicles with ETCS" differently from Plaintiffs' other requests for injunctive relief or from the other types of relief Plaintiffs seek. While NHTSA has been involved in an ongoing investigation into the SUA issues and, under the Safety Act, possesses discretion to administer a recall where it determines that a motor vehicle contains a defect relating to safety, NHTSA's involvement and discretion do not indicate that Congress intended to split remedies for the purpose of determining whether an actual conflict exists. Toyota has not offered evidence that the language or legislative history of the Safety Act evince such an intent to split remedies. Thus, the Court sees no reason to treat Plaintiffs' request for a recall differently from its other requests for relief in determining whether an actual conflict exists.

Even if the Court were to consider Plaintiffs' request for a recall separately from Plaintiffs' other requests for relief for the purpose of its preemption analysis, the Court finds that Toyota has not demonstrated that an actual conflict exists. In support of its contention that Plaintiffs' requested relief is conflict-preempted, Toyota argues that "there is a very real and substantial possibility that ... the recall ... may frustrate, interfere and conflict with NHTSA's ongoing efforts to investigate and address the very same issues." (Defs.' Mem. at 53.) First, the Court notes that a "real and substantial possibility" of conflict is insufficient to warrant

dismissal on preemption grounds. A state law is preempted only "to the extent that it *actually conflicts* with federal law." *Pac. Gas & Elec. Co.*, 461 U.S. at 204, 103 S.Ct. 1713 (emphasis added). Toyota counters that the "conflict between NHTSA's recall power and Plaintiffs' proposed remedy is more real and present than that in the cases affirming preemption of proposed judicial recalls." (Reply at 20.) However, the Court disagrees with the reasoning underlying the preemption analysis in those cases. Second, "to constitute an actual conflict, the state law at issue must conflict with the intent of Congress in a specific and concrete way." *Kent*, 200 F.Supp.2d at 1217. Congress' primary intent in passing the Safety Act is articulated most clearly "in the first section of the Act itself: 'the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents.'" *Chrysler Corp. v. Tofany*, 419 F.2d 499, 508 (2d Cir.1969). Toyota has not shown that a court-ordered recall would frustrate Congress' intent to "reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents,"[33] or that Plaintiffs' proposed remedy would actually conflict with NHTSA's ongoing investigation. Like the defendant in *Kent*, Toyota "[a]t most ... has demonstrated that the relief sought by Plaintiffs *might* conflict with some future action of NHTSA as it investigates the alleged defect[s] at issue in this action." *Kent*, 200 F.Supp.2d at 1217–18. Thus, Toyota has failed to show that Plaintiffs'

---

not detract from the soundness of the *Kent* court's reasoning that Congress did not manifest an intent to split remedies when determining if conflict preemption applies.

**33.** While Congress also intended to promote uniformity, uniformity is merely a secondary objective of the Safety Act. *See Tofany*, 419 F.2d at 511; *Buzzard v. Roadrunner Trucking,*

*Inc.*, 966 F.2d 777, 783–84 (3d Cir.1992); *Chamberlan*, 314 F.Supp.2d at 962–63. Thus, even if Toyota were to argue that Plaintiffs' requested relief would undermine the uniformity Congress sought to promote in passing the Safety Act, "some negative effect on uniformity" is not sufficient to trigger preemption of State law under the Safety Act. *Buzzard*, 966 F.2d at 783–84.

proposed remedy actually conflicts with the Safety Act.

As a final note, the Court is not persuaded by Toyota's contention that Plaintiffs' reliance on *Chamberlan, Kent,* and *Marsikian* is misplaced. Toyota contends that these cases are inapposite because the injunctive relief sought by the plaintiffs in those cases did not necessarily amount to a nationwide recall.[34] (*See* Reply at 18–19.) Specifically, Toyota argues that the *"Chamberlan* court explicitly held that *Bridgestone* [ ] and *Lilly* are distinguishable on their facts because the plaintiffs sought a court-initiated nationwide recall." (*Id.* at 19, emphasis omitted.) Although the *Chamberlan* court did state that *Bridgestone* and *Lilly* were distinguishable on their facts, this was not part of the court's holding. The *Chamberlan* court stated that "[i]n addition to being distinguishable on [their] facts," *Bridgestone* and *Lilly* were "based on reasoning this Court finds unpersuasive," as they "applied too broadly the conflict preemption analysis." 314 F.Supp.2d at 965, 967. Moreover, the foregoing analysis applies with equal force to a nation-wide recall as to a state-wide recall, as the scope of a requested recall would not alter the court's analysis of the applicability of the presumption against preemption or of Toyota's failure to demonstrate an actual conflict between Plaintiffs' claims or requested relief and the Safety Act.[35]

Accordingly, the Court finds that Plaintiffs' claims and requests for relief are not preempted by the Safety Act.

### B. *Primary Agency Jurisdiction*

■ Toyota argues that even if the Court does not strike Plaintiffs' request for injunctive relief on preemption grounds, it should do so under the doctrine of primary jurisdiction. (Defs.' Mem. at 54.) Under this doctrine, "Courts may find that an administrative agency has 'primary jurisdiction' over a judicially cognizable claim where 'enforcement of the claim requires the resolution of issues, which, under a regulatory scheme, have been placed within the special competence of an administrative body.' " *Marsikian,* 2009 U.S. Dist. LEXIS 117012, at *23–24 (quoting *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).

The Court declines to apply the primary jurisdiction doctrine and, therefore, will not strike Plaintiffs' request for injunctive relief or refer any issues underlying Plaintiffs' claims to NHTSA at this stage. As explained in the Court's preemption analysis, Toyota has not shown that an actual conflict exists between Plaintiffs' claims or requested relief and the NHTSA investigation. At this point, therefore, the interests of uniformity and promotion of "proper relationships between the courts and ad-

---

**34.** Toyota also points out that Plaintiffs have not cited "a single case granting a nationwide court-ordered vehicle recall." (Reply at 20, emphasis omitted.) At this stage, however, the Court is presented with the question of whether the request for relief must be eliminated from Plaintiffs' MCC, not whether, in the event that Plaintiffs succeed on their claims, a nationwide court-ordered recall is an appropriate remedy. Thus, Toyota's argument that no court has ultimately ordered a nationwide vehicle recall does not persuade the Court that the reasoning in *Chamberlan, Kent,* and *Marsikian* is any less persuasive in

determining whether conflict preemption requires the Court to dismiss Plaintiffs' claims or strike Plaintiffs' requested remedy at the pleading stage.

**35.** If Toyota's distinction between state-wide and nation-wide recalls was correct, it would be difficult to see how a recall in California— where more than ten percent of the nation resides and likely more than ten percent of the nation's vehicles are maintained—would not also be disruptive of the Safety Act. *See Chamberlan,* 314 F.Supp.2d at 964–65.

ministrative agencies" do not require application of the primary jurisdiction doctrine. *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303–04, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Furthermore, the claims that Plaintiffs assert in this case do not arise under the Safety Act or NHTSA regulations; rather, they are based on California statutes, the MMA, and general contract and tort principles.[36] Plaintiffs' claims therefore are "within the conventional competence of the courts." *Id.* at 305, 96 S.Ct. 1978. Thus, "the Court does not find that exercise of the doctrine of primary jurisdiction is necessary at this stage of the case, either to ensure uniformity of regulation or because NHTSA is better-equipped than the Court to address the issues raised by Plaintiffs' claims." *Kent,* 200 F.Supp.2d at 1218.

Because the Court finds neither preemption nor primary agency jurisdiction, the Court denies the motion to strike the prayer for relief that seeks an injunction requiring the implementation of an effective fail-safe mechanism on all vehicles with ETCS. (*See* MCC at 153, ¶ i.)

### XIII. *Availability of Restitution and/or Restitutionary Disgorgement*

Toyota argues that the Court should strike the Plaintiffs' request for "money Toyota acquired by unfair competition, including restitution and/or restitutionary disgorgement." (¶¶ 329, 338; MCC at 152 (Prayer for Relief ¶ b).) Toyota concedes that restitution is an available remedy under the UCL and FAL. (Defs.' Mem. at 55.) Likewise, Toyota concedes that disgorgement is an available remedy under

the UCL and FAL to the extent it constitutes restitution. (*Id.* at 56.) Nonetheless, Toyota argues that the Court should strike the Plaintiffs' request for restitutionary disgorgement because it is "duplicative, . . . immaterial, impertinent, and unduly prejudicial." (*Id.*)

"Given the[ ] disfavored status [of motions to strike], courts often require a showing of prejudice by the moving party before granting the requested relief." *Mag Instrument, Inc. v. JS Prod., Inc.,* 595 F.Supp.2d 1102, 1106 (C.D.Cal.2008) (citations and internal quotation marks omitted). Although Toyota has made a conclusory statement that the request for restitutionary disgorgement is unduly prejudicial, Toyota has failed to make any showing or offer any argument in support of its contention that the requested relief prejudices Toyota. (*See* Mot. Brief at 56.)

Accordingly, the Court denies the motion to strike Plaintiffs' request for "restitutionary disgorgement."

### XIV. *Remainder of Motion to Strike*

To the extent that the Court's substantive rulings have not otherwise disposed of the particulars raised by the Motion to Strike, the Motion is denied.

### XV. *Conclusion*

As set forth herein, the Court grants in part and denies in part the Motion to Dismiss and Motion to Strike (Docket Nos. 328, 329). Specifically, the Court makes the following rulings:

---

**36.** The Court notes that the classic primary jurisdiction situation is one in which the plaintiffs' claims are predicated on imposing civil liability under a regulatory statute. *See, e.g., W. Pac. R.R.,* 352 U.S. at 62–70, 77 S.Ct. 161 (giving "first pass on the construction of the tariff in dispute" and "the reasonableness of the tariff as applied" to the Interstate Com-

merce Commission). In such situations, the expertise of the regulatory body is particularly helpful in determining whether the regulatory statute itself provides proper grounds for a claim for civil liability. In this case, on the other hand, Plaintiffs' claims are not predicated on the Safety Act.

(1) The Court dismisses without prejudice all the claims of those Plaintiffs who failed to allege facts establishing standing.

(2) As to the fourth cause of action for breach of express warranty based on the written warranty, the Court grants the Motion to Dismiss and dismisses with prejudice this claim to the extent it is based upon design defects rather than defects in materials and workmanship. To the extent the claim is based on defects in materials and workmanship, the Court denies the Motion to Dismiss as to any plaintiff whose vehicle was taken during its warranty period for repair pursuant to the recalls, and any plaintiff who has alleged he or she sought repair during the vehicle's warranty period for SUA-related issues, and was informed either that the vehicle had been repaired or that nothing was wrong with the vehicle. However, based on the additional notice requirement for direct purchasers, and still to the extent that they are based on defects in materials and workmanship rather than on design defects, the claims of plaintiffs who fall into these categories (but who have also alleged that they purchased their vehicles directly from Defendants) are dismissed without prejudice. Finally, the claim of any plaintiff whose warranty period has expired and who failed to repair or respond to one or more of the recalls during the warranty period is dismissed with prejudice.

(3) As to the fourth cause of action for breach of express warranty based on Toyota's advertising, the Motion to Dismiss is granted and the claims of all plaintiffs are dismissed without prejudice for failure to allege exposure to statements made by Toyota.

(4) As to the sixth cause of action for revocation, the Motion to Dismiss is denied as to the Plaintiffs who have alleged they purchased their vehicles directly from Toyota. The Motion to Dismiss is granted as to the claims asserted by all other Plaintiffs, which are dismissed without prejudice.

(5) The Motion to Dismiss is granted in part as to the sixth cause of action. To the extent Plaintiffs have stated express and implied warranty claims, they have also stated claims under the MMA.

(6) The Motion to Dismiss is granted as to the tenth cause of action for unjust enrichment, which is dismissed with prejudice as to all Plaintiffs.

To the extent the Motion to Dismiss is not expressly granted, it is denied.

**IT IS SO ORDERED.**